**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **HAITIAN EVANGELICAL CLERGY ASSOCIATION; SERVICE EMPLOYEES INTERNATIONAL UNION – LOCAL 32BJ; SABINA BADIO FLORIAL; YOUDELAINE DORCIN; ROBERT JEAN ALIX ERINAC; RACHELLE GUIRAND; DIEU YOLNICK JEUNE CADET; AUDOINE AMAZAN; GERALD MICHAUD; NADEGE JOSEPH MICHAUD; and MARIE WILDRIGUE ERINAC MIOT.** | Case No. _____ |
| *Plaintiffs*, | |
| v. | |
| **DONALD J. TRUMP, President of the United States of America; UNITED STATES OF AMERICA; THE DEPARTMENT OF HOMELAND SECURITY; and KRISTI NOEM, Secretary of Homeland Security.** | |
| *Defendants*. | |

## COMPLAINT

*"Give me your tired, your poor, Your huddled masses yearning to breathe free,
The wretched refuse of your teeming shore.
Send these, the homeless, tempest-tost to me,
I lift my lamp beside the golden door!"*

— *Emma Lazarus*

*"They're poisoning the blood of our country."*

— *President Trump*

Haiti is a nation in chaos. In the past several years, violent gangs have taken over Haiti, establishing a "mafia-like model that is so entrenched that the country can barely function without their consent."[1] These gangs control "85% of Port-au-Prince," Haiti's capital city, and they rule

---

[1]   *Last Chance? Breaking Haiti's Political and Criminal Impasse*, GLOBAL INITIATIVE AGAINST TRANSNATIONAL ORGANIZED CRIME at 10 (Jan. 2025), https://globalinitiative.net/wp-content/uploads/2025/01/Last-chance-Breaking-Haitis-political-and-criminal-impasse-GI-TOC-January-2025.pdf

through brute force: in 2024 alone, "[m]ore than 5,600 people were killed and 1,400 were kidnapped."[2] The U.S. State Department advises American citizens to "not travel to Haiti due to kidnapping, crime, civil unrest, and limited health care," noting that "[p]olitical violence and violent crimes are common in Haiti, including murders, kidnappings, robberies, assaults, vehicle break-ins, and home invasions."[3]

Taking circumstances from bad to worse, the gangs dominating Haiti frequently target hospitals, murdering or kidnapping doctors and nurses.[4] Consequently, "only 37 per cent of Haiti's health facilities in Port-au-Prince are fully functional."[5] Given the collapse of Haiti's health care system, the country was ill-equipped to confront a 2024 cholera outbreak with over 10,000 reported cases and remains ill-equipped to handle future public health crises.[6]

The violence has left "more than 1 million people homeless."[7] Those displaced have been forced into "improvised shelters" or have taken up residence in "schools, churches and even government buildings," many of which "have no running water, flushing toilets or garbage

---

[2]   *New leader takes over Haiti's transitional presidential counsel as violence persists*, ASSOCIATED PRESS (March 7, 2025), https://apnews.com/article/haiti-transitional-presidential-council-fritz-alphonse-jean-gangs-c95b666317c278fee61e5ef1fac7b01b; Fredlyn Pierre Louis, *Haitian immigrants grapple with uncertainty as TPS end date looms*, NBC NEWS (March 8, 2025), https://www.nbcnews.com/news/nbcblk/haitian-immigrants-grapple-uncertainty-tps-end-date-looms-rcna193868.

[3]   Travel Advisory: Haiti, U.S. Dept. of State (Sept. 18, 2024), https://travel.state.gov/content/travel/en/international-travel/International-Travel-Country-Information-Pages/Haiti.html; U.S. Embassy in Haiti, Information for Travelers, https://ht.usembassy.gov/u-s-citizen-services/local-resources-of-u-s-citizens/information-for-travelers/#:~:text=Political%20violence%20and%20violent%20crimes,%2Dau%2DPrince%20international%20airport.

[4]   *Haiti gang crisis: Top rights expert decries attacks on hospitals*, UN NEWS (Jan. 3, 2025), https://news.un.org/en/story/2025/01/1158721#:~:text=%E2%80%9CCriminal%20gangs%20have%20murdered%20and,close%20or%20suspend%20their%20operations%E2%80%9D.

[5]   *Id.*

[6]   *External situation report: Multi-country outbreak of cholera*, WORLD HEALTH ORGANIZATION (Jan. 24, 2025), https://www.who.int/docs/default-source/coronaviruse/situation-reports/20250110_multi-country_outbreak-of-cholera_sitrep--22.pdf?sfvrsn=568bf6d_3&download=true.

[7]   *Evens Sanon, Gangs attack a neighborhood in Haiti that's home to the country's elite*, ASSOCIATED PRESS (Feb. 4, 2025), https://apnews.com/article/haiti-gang-violence-kenscoff-capital-97e5fd96b963670a4faf8675d1ea7310.

pickup."[8] "The humanitarian crisis in Haiti has reached 'alarming levels'" with "nearly 2 million people facing emergency levels of food insecurity and 6,000 in catastrophic conditions facing starvation."[9]

Due in large part to these conditions, Haitians present in the United States enjoy Temporary Protected Status (TPS). The Secretary of Homeland Security may designate a country for TPS if the country meets certain criteria. For example, a country may be designated if there are "extraordinary and temporary conditions in the foreign state that prevent aliens who are nationals of the state from returning to the state in safety." 8 U.S.C. § 1254a(b)(1)(C). Once a country is designated for TPS, its citizens who are present in the United States enjoy work authorization and protection from deportation. *Id*. at § 1254a(a)(1). An initial TPS designation runs for a fixed period of between 6 and 18 months and may be extended or terminated only after a statutorily prescribed periodic review. *Id*. § 1254a(b)(3). If not affirmatively terminated, the designation is automatically extended. *Id*. § 1254a(b)(3)(C). If a designation is terminated, the termination cannot take effect until the initial designation or subsequently extended designation is scheduled to expire. *Id*. § 1254a(b)(3)(B).

Put another way—and as this Court recognized years ago—the executive branch does not have unbridled authority to end a country's TPS designation on a whim. *Saget v. Trump*, 375 F. Supp. 3d 280, 332 (E.D.N.Y. 2019) (Kuntz, J.). Despite this, the newly installed DHS Secretary, Kristi Noem, purported to "partially vacate" Haiti's TPS designation, such that it will end six months earlier than its previously fixed expiration date. But Secretary Noem not only terminated

---

[8]  Frances Robles, *How 360,000 Haitians Wound Up Living in Empty Lots and Crowded Schools*, N.Y. TIMES (May 10, 2024), https://www.nytimes.com/2024/05/08/world/americas/haiti-gangs-refugees-crisis.html.

[9]  *U.N. Chief warns gangs could overrun Haiti's capital without additional support*, ASSOCIATED PRESS (Jan. 23, 2025), https://www.npr.org/2025/01/23/g-s1-44314/gangs-could-overrun-haiti

Haiti's TPS designation prematurely—something that she may not do under any circumstance—she did so without conducting the periodic review the statute requires.

We've seen this play before. The first Trump administration purported to terminate Haiti's TPS designation without following the statutorily mandated process. But this Court correctly concluded that the first Trump administration's decision to terminate TPS was unlawful and enjoined it—both because it violated the Administrative Procedure Act (APA) and the Equal Protection Clause. *See generally Saget*, 375 F. Supp. 3d 280.

History now repeats itself. While campaigning, President Trump previewed that if elected he would end Haiti's TPS designation.[10] He made comments that suggest a discriminatory animus towards nonwhite immigrants, claiming that Haitian TPS recipients were stealing and eating the house pets of American citizens while simultaneously expressing a preference for immigrants from predominantly white—in his words, "nice"—nations like Switzerland and Norway.[11] He said that nonwhite immigrants are "poisoning the blood" of the United States.[12] He claimed that Haitians all "have AIDS,"[13] a statement he also made during his first term. *Saget*, 375 F. Supp. 3d at 371.

Plaintiffs are individual Haitians who hold TPS as well as organizations with members who are Haitian TPS holders. The short-term consequences of the Trump administration's unlawful decision are dire: TPS holders will lose their ability to legally work in the United States, jeopardizing their ability to provide for themselves and their families. The long-term consequences,

---

[10]    Maggie Astor, *Trump Says He Would Try Again to Revoke Haitian Immigrants' Protections*, N.Y. TIMES (Oct. 3, 2024), https://www.nytimes.com/2024/10/03/us/politics/trump-haitian-immigrants-legal-status.html.

[11]    Maggie Haberman & Michael Gold, *Trump, at Fund-Raiser, Says He Wants Immigrants From "Nice" Countries*, N.Y. TIMES (April 7, 2024), https://www.nytimes.com/2024/04/07/us/politics/trump-immigrants-nice-countries.html.

[12]    Hannah Fingerhut and Ali Swenson, *Trump defends controversial comments about immigrants poisoning the nation's blood at Iowa Rally*, ASSOCIATED PRESS (December 19, 2023), https://apnews.com/article/donald-trump-immigration-iowa-dff7f632948fa6511fb7d1955a28610c.

[13]    *Trump Slams Haitians attempting to enter U.S., says they 'probably have AIDS*,' ABC 7 (Oct. 10, 2024), https://abc7.com/haitian-migrants-donald-trump-former-president-immigration/11108741/.

however, are far worse: if forced to return to Haiti, TPS holders face imminent danger and even death. Haiti is wracked by political instability, rampant violence, widespread human-rights abuse, limited healthcare, and pervasive food insecurity.

TPS holders have clean records—the statute *expressly excludes* those with more than one misdemeanor from its protection. Nor are they a drain on public resources—the statute *expressly prevents* TPS holders from obtaining federal public benefits. TPS holders' labor and civic engagement have revitalized communities across America, from Brooklyn, New York and Springfield, Ohio to Miami, Florida, and numerous places in-between. Haitian TPS holders have a justified, statutorily guaranteed expectation that Haiti's TPS designation will remain in place until lawfully terminated—something that the administration cannot do prematurely or without engaging in the statutorily prescribed process.

As before, the Trump administration's decision to end Haiti's TPS designation is unlawful. The decision is *ultra vires*; the administration has neither statutory nor inherent authority to terminate a country's TPS designation before the designation's previously fixed expiration date. Moreover, because it was not a product of the statutorily mandated review process, the termination is arbitrary and capricious and thus a violation of the APA. And because the President's own statements suggest that the decision to terminate TPS was motivated by President Trump's discriminatory animus against nonwhite immigrants, the decision to end Haiti's TPS designation violates TPS holders' due-process and equal-protection rights.

Put simply: the Trump administration's decision to prematurely terminate Haiti's TPS designation is unlawful. It should be set aside.

## PARTIES

1.      Individual Plaintiffs Sabina Badio Florial, Youdelaine Dorcin, Robert Jean Alix Erinac, Rachelle Guirand, Dieu Yolnick Jeune Cadet, Audoine Amazan, Gerald Michaud, Nadege Joseph Michaud, and Marie Wildrigue Erinac Miot are all Haitian nationals and beneficiaries of TPS. Each has made a life in this country in the reasonable expectation that, as mandated by Congress, they would be allowed to live and work in the United States until it was safe to return to Haiti. Unless the administration's unlawful, premature termination of Haiti's TPS designation is set aside, Plaintiffs' TPS status will expire on August 3, 2025, six months earlier than permitted by statute.

2.      The consequences are dire and potentially life threatening. TPS holders would immediately lose their work authorization and face deportation to a country that, according to the State Department, is currently suffering from "humanitarian, security, and political crises."[14] If forced to return to Haiti, TPS holders will encounter organized violence, human rights abuse, inadequate medical care, insufficient food, and a non-existent infrastructure. There are no essential services—no police, few hospital beds, little food, water, or adequate shelter.

3.      Moreover, if deported, TPS holders may face a statutory bar that would prevent them from returning to the United States for ten years, even to visit their own children, who they may be forced to leave behind. 8 U.S.C. § 1182(a)(9)(A)(ii). Indeed, once TPS for Haiti ends, many will face a ten-year statutory bar to re-entry even if they depart the U.S. on their *own*. *See* 8 U.S.C. § 1182(a)(9)(B)(i)(II). In short, Haitians who hold TPS will suffer serious and immediate harm if the Trump administration's unlawful action is permitted to stand.

---

[14]    U.S. Dept. State, U.S. Relations with Haiti, https://www.state.gov/u-s-relations-with-haiti/ (Jan. 20, 2025).

4.      Plaintiff Sabina Badio Florial is a Haitian TPS holder. She lives in Farmingdale, New York. Ms. Florial works for Northwell Health processing specimens in a laboratory setting. In the past, Ms. Florial has worked as a health home aide for Bristol Assisted Living. In 2013, she got married to another Haitian TPS beneficiary. Their children were born in New York and are thus United States citizens. Ms. Florial is active in her church, the Beraca Baptist Church, and hopes to return to school to become a licensed laboratory technician.

5.      Plaintiff Youdelaine Dorcin is a Haitian TPS holder. She lives in Brooklyn, New York. Ms. Dorcin works full-time as a bookkeeper at Catholic Charities of Brooklyn and Queens, where she also assists with intake and translation services. Ms. Dorcin earned an associate's degree in culinary arts in 2015 and worked as a chef in various settings for many years. Just last year, Ms. Dorcin earned a bachelor's degree in community health. Her dream is to obtain her master's in public health and work for the CDC.

6.      Plaintiff Robert Jean Alix Erinac is a Haitian TPS holder. He lives in Medford, New York with his wife and three children, who are all U.S. citizens. Mr. Erinac is a school bus driver and hopes to someday become a licensed practical nurse. Mr. Erinac is currently obtaining treatment at Sloan Kettering for malignant stomach cancer, with which he was diagnosed in October 2024. His cancer requires him to take medication to shrink the size of the tumor to the point where it can be surgically removed.

7.      Plaintiff Marie Wildrigue Erinac Miot is a Haitian TPS recipient. She lives in Medford, New York with her husband, Plaintiff Robert Jean Alix Erinac, and their three children. Mrs. Erinac is a registered nurse. Mrs. Erinac supplies her family's health insurance through her job, including for Mr. Erinac's cancer care. In addition to emotionally supporting Mr. Erinac

through his treatment, she provides financial support to her mother-in-law, sisters, and mother. She hopes to return to school to become a nurse practitioner.

8.      Plaintiff Rachelle Guirand is a Haitian TPS holder. She lives in Baldwin, New York. Ms. Guirand works at The Bristal Assisted Living facility in North Hills, where she administers medication to residents. Her son is a United States citizen.

9.      Plaintiff Dieu Yolnick Jeune Cadet is a Haitian TPS holder. She lives in Port St. Lucie, Florida. She works as a certified nursing assistant and behavior technician for Elder Home Care Services. In the past, she has worked for the Palm Beach School District and as a behavior assistant helping special needs children. Ms. Jeune Cadet has five children, aged fourteen to thirty-four. Three of them are also TPS holders. Her youngest child, who was born in the United States, suffers from severe mental health conditions, and Ms. Jeune Cadet depends on her job to pay out-of-pocket expenses for her daughter's mental healthcare. Ms. Jeune Cadet hopes to become a registered nurse.

10.      Plaintiff Audoine Amazan is a Haitian TPS holder. He lives in Brooklyn, New York. He is employed as a direct support professional for a company called QSAC but is a professional musician by training; he is a trumpeter who studied music in Haiti.  He plays classical and jazz. He also studies English and hospitality management at Borough of Manhattan Community College and aspires to obtain his GED. He has a child, a toddler, who resides in Haiti. He supports his significant other and his child by sending them money once or twice per month.

11.      Plaintiff Gerald Michaud is a Haitian TPS holder. He lives in Brooklyn, New York. He was a journalist in Haiti and was in the United States on a visa in 2010 when the earthquake struck Haiti and has received TPS protection since. He is a licensed security guard and for the last many years has worked full-time at Laguardia Airport and also part-time teaching martial arts to

children in after-school programs.  Mr. Michaud created and has been the financial support for a foundation in Haiti dedicated to preventing gang membership by teaching children Haitian culture and traditional dance.

12.    Plaintiff Nadège Joseph Michaud is a Haitian TPS holder. She lives in Brooklyn, New York with her husband, Plaintiff Gerald Michaud. Mrs. Michaud works in the food service industry and is trained as a nursing assistant. She and Mr. Michaud provide most of the financial support for one of Mrs. Michaud's nieces, age seven, who lives in Orlando, Florida. They regularly send remittances to other family members in Haiti, including Mrs. Michaud's siblings and their children. Mrs. Michaud hopes to obtain her license to become a certified nursing assistant.

13.    Plaintiff Haitian Evangelical American Clergy Association (HECA) is an association of churches located in Brooklyn, Queens, Long Island, and elsewhere within the Eastern District of New York. Its mission, like most religious organizations, is to promote the Christian gospel and to prepare parishioners to be good earthly citizens. Most of HECA's parishioners are Haitians, and many of HECA's parishioners are TPS holders. In addition to its provision to parishioners of weekly church services and spiritual guidance and counseling, HECA and its member churches provide numerous services to Haitian TPS holders including assistance in preparing their individual TPS applications.

14.    SEIU Local 32BJ is a local chapter of the Service Employees International Union. Its members include many Haitian TPS holders, including Plaintiff Gerald Michaud. Its mission is to build and grow a diverse, effective, politically independent and democratic organization of workers. SEIU Local 32BJ is a membership organization with approximately 175,000 property service workers along the east coast, including in Brooklyn, Queens, and elsewhere within the Eastern District of New York. SEIU Local 32BJ has members who are able to obtain

employment—and, therefore, able to afford their union dues—solely because of their TPS status. SEIU Local 32BJ also conducts political advocacy, including around immigration matters. Having the voices of Haitian TPS holders informs and lends credibility to SEIU Local 32BJ policy and political positions.

15.    Defendant Donald Trump is the President of the United States. He is sued in his official capacity.

16.    Defendant United States of America includes all government agencies and departments responsible for the termination or vacatur of Haitian nationals' eligibility for TPS.

17.    Defendant Department of Homeland Security is an agency of the United States government and is responsible for designating countries whose nationals may receive TPS, and for administering the TPS program.

18.    Defendant Kristi Noem, who issued the decision purporting to "partially vacate" Haiti's TPS designation, is the Secretary of the Department of Homeland Security. She is sued in her official capacity.

## JURISDICTION AND VENUE

19.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331, as this case arises under the United States Constitution and the Administrative Procedure Act (APA), 5 U.S.C. § 551 et seq. This Court has remedial authority pursuant to the APA, 5 U.S.C. § 706, and the Declaratory Judgment Act, 28 U.S.C. §§ 2201 et seq.

20.    The federal government has waived sovereign immunity and permitted judicial review of agency action under 5 U.S.C. § 702. *Up State Fed. Credit Union v. Walker*, 198 F.3d 372, 375 (2d Cir. 1999). In addition, claims against federal officials are not barred by sovereign immunity when they seek relief other than monetary relief. *See, e.g., Larson v. Domestic &*

*Foreign Com. Corp.*, 337 U.S. 682, 697–99 & nn.18-19 (1949); *Shields v. Utah Idaho Cent. R.R. Co.*, 305 U.S. 177, 183–84 (1938).

21.     Venue is proper in the Eastern District of New York because at least one Plaintiff resides in this judicial district and each Defendant is an agency of the United States or an officer of the United States sued in his or her official capacity. 28 U.S.C. § 1391(e)(1).

## FACTUAL ALLEGATIONS

### *Background on Temporary Protected Status*

22.     Temporary Protected Status (TPS) was created by Congress as part of the Immigration Act of 1990. 104 Stat. 4978, 5030 (1990). Congress enshrined TPS into law to further a core American value: That the United States is a "beacon of freedom" to those displaced from their homelands by havoc beyond their control. 126 Cong. Rec. H8687 (Oct. 2, 1990) (statement of Rep. Moakley); *see also* Emma Lazarus, The New American Colossus (1883). TPS permits individuals from designated foreign countries to live and work lawfully in the United States when they cannot return safely to their homeland due to armed conflict, natural disaster, or other "extraordinary" circumstances. *See* 8 U.S.C. § 1254a.

23.     In 2002, the authority to designate a country for TPS was transferred to the Department of Homeland Security (DHS). *See* Homeland Security Act of 2002, Pub. L. 107-296, 116 Stat. 2135, 2142–45, 2177–2212 (Nov. 25, 2002); Homeland Security Act of 2002 Amendments Act, Pub. L. 108-7, 117 Stat. 11, 526–32 (Feb. 20, 2003).

24.     The TPS statute establishes both the standards and the process for determining whether a country should receive TPS designation, and whether that designation subsequently should be extended or terminated. *See* 8 U.S.C. § 1254a. After it has engaged in the requisite

process and considered the relevant factors, DHS may grant, extend, or terminate a country's TPS designation.

25.    Following "consultation with the appropriate agencies of the Government," the Secretary of Homeland Security may designate a country for TPS if she finds:

(A) that there is an ongoing armed conflict within the state and, due to such conflict, requiring the return of aliens who are nationals of that state to that state (or to the part of the state) would pose a serious threat to their personal safety;

(B) that—

(i) there has been an earthquake, flood, drought, epidemic, or other environmental disaster in the state resulting in a substantial, but temporary, disruption of living conditions in the area affected;

(ii) the foreign state is unable, temporarily, to handle adequately the return to the state of aliens who are nationals of the state; and

(iii) the foreign state officially has requested designation under this subparagraph; or

(C) that there exist extraordinary and temporary conditions in the foreign state that prevent aliens who are nationals of the state from returning to the state in safety, unless the [DHS Secretary] finds that permitting the aliens to remain temporarily in the United States is contrary to the national interest of the United States.

8 U.S.C. § 1254a(b)(1).

26.    DHS has the authority to designate a country for TPS for a period of six to eighteen months. 8 U.S.C. § 1254a(b)(2).

27.    If an individual from a TPS-designated country satisfies the statutory eligibility criteria, that individual is granted deportation protection and employment authorization.

28.    An individual is ineligible for TPS if they have been convicted of a felony or two or more misdemeanors in the United States. 8 U.S.C. § 1254a(c)(2)(B). Individuals also are ineligible for TPS if DHS determines that they committed a serious crime before coming to the

U.S., engaged in certain enumerated activities, or constitute a danger to the security of the United States. 8 U.S.C. § 1254a(c)(2)(B)(ii); 8 U.S.C. § 1158(b)(2)(A).

29.    Moreover, to be eligible for TPS, an individual must be a national of the TPS-designated country; have been present in the United States on the date of the designation; and register within a designated time frame. 8 U.S.C. § 1254a(c)(1)(A); 8 C.F.R. § 244.2.

30.    When the Secretary designates a country for TPS, she must conduct a periodic review of that designation. 8 U.S.C. § 1254a(b)(2). At least sixty days before the TPS designation expires, the Secretary, in consultation with the other appropriate agencies, must review the conditions in the foreign state. 8 U.S.C. § 1254a(b)(3)(A). The law establishes a mandatory procedure for extending or terminating a designation. Unless the Secretary affirmatively determines, after consultation with the appropriate agencies, that a foreign state "no longer meets the conditions for designation under" 8 U.S.C. § 1254a(b)(1), the designation is automatically extended for an additional period of at least six months. 8 U.S.C. § 1254a(b)(3)(C). Like the Secretary's initial decision to designate a country, the Secretary's decision to extend or terminate a country's TPS designation must be the product of inter-agency consultation and a "review of the conditions in the [previously designated] foreign state." 8 U.S.C. § 1254(b)(3)(B)-(C).

31.    Congress placed no restrictions on the number of times TPS can be extended or redesignated. So long as the periodic mandatory review finds that the statutory conditions for designation continue to exist, the Secretary must extend the designation.

32.    The TPS statute does not allow the Secretary to terminate a designation prematurely. If upon periodic review the Secretary decides to terminate a country's TPS designation, that termination may not take effect until 60 days after notice is published in the Federal Register or, if later, when the current designation period expires. 8 U.S.C. § 1254a(b)(3)(B).

33.     Given the statutorily prescribed procedure for terminating a country's TPS designation, DHS does not have inherent authority to vacate or rescind a designation but must instead follow the congressionally mandated procedure.

### *History of TPS Determinations Relevant to Plaintiffs*

#### *Designation: August 2021*

34.     Haiti was initially designated for TPS in 2010 during the Obama administration, following a devastating earthquake that killed more than 200,000 people and caused more than $7 billion in damages. 75 Fed. Reg. 3476 (Jan. 21, 2010). Haiti's TPS designation was extended or redesignated multiple times between 2011 and 2015. *See* 76 Fed. Reg. 29000 (May 19, 2011); 77 Fed. Reg. 59943 (Oct. 1, 2012); 79 Fed. Reg. 11808 (Mar. 3, 2014); 80 Fed. Reg. 51582 (Aug. 25, 2015). In each extension or redesignation, the Department of Homeland Security outlined conditions arising from the 2010 earthquake and its attendant damage to infrastructure, public health, agriculture, transportation, and educational facilities. Each extension or redesignation also cited the cholera epidemic that had broken out in Haiti following the 2010 earthquake, as well the earthquake's exacerbation of Haiti's pre-existing vulnerabilities, including food insecurity and a lack of adequate housing.

35.     As detailed below, a prior DHS secretary in the first Trump administration unlawfully tried to end Haiti's TPS designation but this Court enjoined that attempt. *See generally Saget v. Trump*, 375 F. Supp. 3d 280 (E.D.N.Y. 2019).

36.     During the Biden administration, DHS Secretary Alejandro Mayorkas designated Haiti for TPS on August 3, 2021. 86 Fed. Reg. 41863 (Aug. 3, 2021). Secretary Mayorkas concluded that "Haiti is grappling with a deteriorating political crisis, violence, and a staggering increase in human rights abuses." *Id*. at 41864. Further, Secretary Mayorkas cited Haiti's dire

economic conditions, severely limited healthcare infrastructure, and pervasive food insecurity as additional reasons that justified the country's TPS designation. *See generally*, *id*.

37.    As to Haiti's political crisis, Secretary Mayorkas noted that "[d]ue to political gridlock and the failure of parliament to approve an elections law and a national budget, parliamentary elections scheduled for October 2019 did not take place," and that the country's president had begun and then continued "to rule by decree, without a legislative body,"  after the country's "parliament lapsed, leaving only 10 senators and no deputies remaining in office. 86 Fed. Reg. at 41864–65.

38.    With respect to human rights violations and abuses, Secretary Mayorkas concluded among other things that, as a result of ruling by decree, Haiti's President

> became increasingly authoritarian through reliance on executive decrees to accomplish his agenda, including the creation of an intelligence agency accountable only to the president. The Human Rights Component of the United Nations Integrated Office in Haiti and the Office of the High Commissioner for Human Rights reported a staggering 333% increase in the number of human rights violations and abuses by law enforcement officials and non-state actors, respectively, against the rights to life and security of person in the period between July 2018 and December 2019.

 86 Fed. Reg. at 41865.

39.    With respect to security concerns, Secretary Mayorkas found, among other things, that "[v]iolent criminal gangs pose a growing challenge to state authority, including de facto control of territory," and that "[f]rom 2019–2021 a new federation emerged, uniting urban criminal gangs that control entire neighborhoods in the capital city of Port-au-Prince." 86 Fed. Reg. at 41865. Citing a U.S. State Department report, Secretary Mayorkas further noted that "gang activity was also on the rise outside of Port-au-Prince" and that the last months of 2020 "were particularly dangerous, with 14 kidnappings reported at that time." *Id*. Similarly, he noted, "[i]n January 2021, a leading Haitian human rights organization, the Center for the Analysis and Research of Human

Rights … [found] that over a third of Haiti's voters now live in areas controlled by criminal gangs." *Id*. at 48166. Secretary Mayorkas further found that Haitian police and state officials were complicit "in gang attacks that left hundreds of people dead" and that "[r]obberies and kidnappings have become a daily reality as buses get intercepted by armed gangs controlling access to large swaths of the country." *Id*.

40.    As to Haiti's economic situation, Secretary Mayorkas concluded that

Haiti's economic and social development continue to be hindered by political instability, governance issues, and fragility. With a Gross Domestic Product (GDP) per capita of US $1,149.50 and a Human Development Index ranking of 170 out of 189 countries… Haiti remains the poorest country in the Latin America and Caribbean region and among the poorest countries in the world.

86 Fed. Reg. at 41866. He further found that "[p]ublic frustration with economic woes has contributed greatly to ongoing demonstrations, some of which have become violent." *Id*.

41.    Concerning Haiti's healthcare situation, Secretary Mayorkas found that "only 31% of Haitians have access to healthcare services" and that numerous "vector-borne diseases are prevalent in Haiti, including malaria, chikungunya, dengue, and Zika." 86 Fed. Reg. at 41867. And Secretary Mayorkas found that in a "country of 11 million people … Haiti only has the capacity to treat a few hundred patients at a time, due to suboptimal coordination within the state apparatus [and] inadequate funding of the national response plan." *Id*.

42.    Concerning food insecurity and access to basic services, Secretary Mayorkas found that "[a]ccording to the World Food Programme … Haiti has one of the highest levels of food insecurity in the world," with "[m]ore than half of the population … chronically food insecure." 86 Fed. Reg. at 41867. He also found that, "[a]ccording to UNICEF, 4.1 million Haitians (nearly 40 per cent of the Haitian population) are estimated to be food insecure, and the estimated number of children suffering from acute malnutrition has risen to 167,000." *Id*.

43.     Secretary Mayorkas further found that, "as a result of deadly gang clashes, the displaced are in need of urgent humanitarian assistance and protection. Priority needs include sanitation, shelter, access to clean water and food." *Id.*

44.     Based on these and other factors, Secretary Mayorkas concluded, "after consultation with the appropriate U.S. Government agencies," that "the statutory conditions supporting Haiti's designation for TPS on the basis of extraordinary and temporary conditions are met." 86 Fed. Reg. at 41868. Secretary Mayorkas designated Haiti for TPS for eighteen months "from August 3, 2021 through February 3, 2023." *Id.*

### *Redesignation and extension: January 2023*

45.     On January 26, 2023, Secretary Mayorkas both redesignated Haiti for TPS, and extended Haiti's then current TPS designation. 88 Fed. Reg. 5022 (Jan. 26, 2023). Secretary Mayorkas "determined that an 18-month TPS extension is warranted because the extraordinary and temporary conditions supporting Haiti's TPS designation remain and that such extension is not contrary to the national interest of the United States" and "further determined that redesignating Haiti for TPS based on extraordinary and temporary conditions … is warranted, including a determination that redesignation is not contrary to the national interest of the United States." *Id.* at 5025. In pertinent part, Secretary Mayorkas cited Haiti's continued political turmoil and country-wide security concerns, recent environmental disasters, humanitarian abuses, deteriorated economic conditions, and still-ongoing food insecurity as reasons justifying extension of the TPS designation.

46.     Concerning the political situation, in addition to making many of the same findings set forth in his 2021 designation, Secretary Mayorkas noted that after the July 7, 2021, assassination of Haiti's president the then-recently appointed prime minister "was installed as head

of a new government" that in turn "collud[ed]" with "illegal armed groups … in the absence of political will to hold corrupt officers accountable." 88 Fed. Reg. at 5025–26.

47.    Concerning the security situation, Secretary Mayorkas found, among other things, that following the July 2021 assassination of its president, "Haiti has experienced a sharp deterioration in an already fragile security situation," and that "[g]ang violence and kidnappings have spiked throughout the country, particularly in the capital, Port-au-Prince." *Id*. at 5026. In particular,

> The United Nations documented 934 killings, 684 injuries, and 680 kidnappings in Port-au-Prince from January to June 2022. In one 10-day period in July 2022, more than 200 people were killed in gang violence in Port-au-Prince; nearly half of the decedents had no gang ties.

*Id*. Furthermore, the Secretary found that

> Haitian gangs have also attacked religious and government infrastructure. On June 10, 2022, a gang known as 5 Seconds took temporary control of the Court of First Instance, the main courthouse in Port au Prince. While the courthouse had not been used for criminal trials for several years due to persistent insecurity, the gang nevertheless forced judicial officials out and stole computers, desks, and other assets.

*Id*. That is not all. The Secretary also found that

> In mid-September, gangs blocked access to the Varreux Terminal in Port-au-Prince, the main entry point for fuel in Haiti, cutting off millions of gallons of diesel and gasoline and causing a severe fuel shortage. The fuel blockage paralyzed Haiti's economy. Health centers and hospitals had to close, and the distribution of water was interrupted. The lack of access to clean water contributed to the outbreak of cholera in early October, and complicated efforts to respond to and contain the outbreak.

*Id*.

48.    In addition, Secretary Mayorkas identified "recent environmental disasters" that "contributed to the extraordinary and temporary conditions in Haiti." 88 Fed. Reg. at 5027. First, he cited both (1) the "7.2 magnitude earthquake [that] hit the southern region of Haiti" on August 14, 2021, "killing more than 2,200 people, injuring 12,700, destroying 130,000 homes, and leaving

thousands of people in urgent need of assistance"; and (2) Tropical Storm Grace, which struck just two days later and unleashed "torrential rains [that] caused floods and landslides in the same departments affected by the earthquake, as well as in Sud-Est." *Id*.

49.    Concerning the humanitarian situation, Secretary Mayorkas found, among other things, that "Haiti has one of the highest levels of chronic food insecurity in the world with more than half of its total population chronically food insecure and 22% of children chronically malnourished." 88 Fed. Reg. at 5027.

> As of October 2022, the total number of people in acute food insecurity stood at 4.7 million people, including 1.8 million people in the 'emergency' phase on the World Food Program's (WFP) Integrated Food Security Classification Index. For the first time ever, 19,000 Haitians are considered to be in the 'catastrophe' phase (the most severe classification).

*Id.* Secretary Mayorkas found that Haiti's security situation exacerbated its humanitarian situation:

> Armed clashes between gangs destroyed water networks and disrupted water truck deliveries in several Port-au-Prince neighborhoods during 2022. A Doctors Without Borders project coordinator noted that in addition to an epidemic of scabies directly connected to the lack of water since the beginning of 2022, people could only 'afford small quantities of drinking water, but they [couldn't] access clean water in quantities needed for hygiene.'" *Id*. "Adding to the struggle Haitians face to meet their basic needs, two WFP warehouses were looted and pillaged in September 2022, resulting in the loss of approximately $6 million of relief assistance, including 2,000 tons of food." *Id*. And "[t]he United Nations and the Haitian government have reported a new cholera outbreak, with the first cases detected between October 1-2, 2022. As of November 15, 2022, there were 8,146 hospitalized suspected cases and 821 confirmed cases of cholera, resulting in 188 deaths.

*Id*.

50.    Concerning Haiti's economic situation, Secretary Mayorkas concluded that

> Haiti's economy has floundered. Haiti is among the countries with the greatest inequality in the region. The richest 20% of its population holds more than 64% of its total wealth, while the poorest 20% has less than 1%.

88 Fed. Reg. at 5027.

51.    "In summary," Secretary Mayorkas concluded, "Haiti is experiencing extraordinary and temporary conditions resulting from grave insecurity and gang crime, as well as socio-economic and humanitarian conditions, including those resulting from environmental disasters aggravating food insecurity." 88 Fed. Reg. at 5028.

*Redesignation and extension: July 2024*

52.    On July 1, 2024, Secretary Mayorkas redesignated and extended Haiti's TPS designation. 89 Fed. Reg. 54484 (July 1, 2024). Secretary Mayorkas "determined that an 18-month TPS extension is warranted because the extraordinary and temporary conditions supporting Haiti's TPS designation remain" and "it is not contrary to the national interest of the United States to permit Haitian TPS beneficiaries to remain in the United States temporarily." *Id*. at 54491. Again, Secretary Mayorkas cited Haiti's continued political turmoil, security concerns, humanitarian abuses, and decimated economy as reasons justifying extension of the TPS designation.

53.    With respect to Haiti's political situation, Secretary Mayorkas found, among other things, that "Haitian gangs are the primary source of violence and instability in Haiti and pose an increasing threat as they continue to escalate and expand their influence and geographic presence over large portions of metropolitan Port-au-Prince" and "several of Haiti's ten departments." 89 Fed. Reg. at 54488. Secretary Mayorkas further noted that, "an ongoing political impasse has left Haiti without a functioning democratically elected national government and hindered Haiti's ability to respond to the gang-driven violence." *Id*. Haiti's "justice system," he concluded, "is plagued by insecurity, corruption, strikes, and political interference." *Id*.

54.    Concerning the security situation, Secretary Mayorkas found, among other things, that "gang violence continues to escalate and expand outside the capital and other major cities." 89 Fed. Reg. at 54488. Secretary Mayorkas noted that, "gang violence killed or injured more than

2,500 people" in the first three months of 2024, and further noted that the gangs have "an established presence in at least six [of Haiti's ten] departments." *Id*. Secretary Mayorkas further noted that, "in early March 2024, gangs attacked police stations and stormed two prisons" allowing more than "4,700 inmates to escape." *Id*. Secretary Mayorkas found that the "coordinated gang attacks" have "displaced over 15,000 people from their homes in Port-au-Prince," and "the U.S. military evacuated all non-essential Embassy personnel by airlift on Saturday, March 9, and Sunday, March 10." *Id*. at 54489.

55.     As to Haiti's humanitarian situation, Secretary Mayorkas found, among other things, that "Haiti has one of the highest levels of chronic food insecurity in the world" with "more than half of its total population chronically food insecure and 22 percent of children chronically malnourished." 89 Fed. Reg. at 54490. Secretary Mayorkas also cited the deleterious impact cholera has had in Haiti, noting that as of January 2024 "an estimated 73,000 Haitians were confirmed or suspected to have cholera across all ten departments." *Id*. at 55491. "Only 55 percent of Haitian households could access safe drinking water while two-thirds of Haitians had limited or no access to sanitation services." *Id*. The intersection of Haiti's gang violence and ill-equipped healthcare system led Secretary Mayorkas to determine that there is a "more significant likelihood of severe disease and death for those Haitians who contract cholera." *Id*.

56.     Concerning Haiti's economic situation, Secretary Mayorkas found, among other things, that "amidst the political, security, and environmental crises, Haiti's economy has been decimated and threatens the future of the country." 89 Fed. Reg. at 54491. Secretary Mayorkas further noted "estimate[s] that three-quarters of Haiti's healthcare facilities lack adequate medical supplies and sufficient trained personnel as the security crisis has led to a mass exodus of health workers." *Id*.

21

57.    Based on these and other factors, Secretary Mayorkas concluded that "after consultation with appropriate U.S. Government agencies," "the conditions supporting Haiti's designation for TPS continue to be met." *Id*. Secretary Mayorkas designated Haiti for TPS for eighteen months "beginning on August 4, 2024, and ending on February 3, 2026." *Id*.

### *President Trump's Unlawful Attempt to Terminate TPS During His First Administration*

58.    Secretary Mayorkas's redesignation and recognition of a deterioration of conditions in Haiti came after the first Trump administration had attempted to terminate TPS for Haiti. That attempt was enjoined by this Court, which concluded (among other things) that the termination decision violated the Administrative Procedure Act and the Equal Protection Clause of the Fifth Amendment. *See generally Saget*, 375 F. Supp. 3d 280.

59.    In November 2017, President Trump's Acting Secretary of Homeland Security, Elaine Duke, announced in a press release that TPS for Haiti would be terminated. *Saget*, 375 F. Supp. 3d at 327–28.

60.    The Federal Register Notice for the termination contained three short paragraphs listing Acting Secretary Duke's rationale for termination. Citing Haiti's President's intention to "rebuild Haiti's National Palace" and finding that "cholera is … at its lowest level since the outbreak began," Acting Secretary Duke determined "that the conditions for the designation of Haiti for TPS under 244(b)(1)(C) of the INA. 8 U.S.C. 1254a(b)(1)(C), are no longer met." 83 Fed. Reg. 2648, 2650 (Jan. 18, 2018).

61.    A group of Haitian TPS holders—some of whom are also Plaintiffs in this case—sued, asserting claims against President Trump, Acting Secretary Duke, and other administration officials. The complaint alleged, among other things, that the termination decision violated both the Fifth Amendment's equal protection clause and the Administrative Procedure Act.

22

62.    Following a week-long hearing during which numerous witnesses testified and thousands of pages of exhibits were introduced, this Court agreed, issuing a lengthy decision enjoining the termination of Haiti's TPS designation. The evidence presented at the hearing included deposition testimony from DHS officials, email communications of both career officials and Trump administration political appointees, and decision memoranda concerning country conditions in Haiti drafted by career USCIS employees but then edited by political appointees to make conditions appear safe for Haitian returnees. *See Saget*, 375 F. Supp. 3d at 301–27.

63.    Among many other things, this Court concluded that the "sequence of events leading up to the decision to terminate Haiti's TPS was a stark departure from ordinary procedure, suggestive of a pre-determined outcome not anchored in an objective assessment, but instead a politically motivated agenda." *Saget*, 375 F. Supp. 3d at 372. For example, the Court found that

> [t]he evidence shows DHS officials pushed back on drafts 'weighted for extension' because extension 'was not the conclusion [they were] looking for.' DHS officials directed USCIS officials to '[b]e creative' in finding 'positive data on the current status of Haiti to bolster the recommendation to terminate TPS.' Plaintiffs offer evidence that DHS and USCIS officials departed from prior practice by changing their interpretation of the TPS statute because the new interpretation would better support termination.

*Id*. at 343 (citations omitted, alterations in original). The Court also pointed to Acting Secretary Duke's supposed "'[r]ationale' for terminating TPS," reciting handwritten notes in which she acknowledged not knowing of a proper basis for terminating Haiti's designation but nevertheless avowed a "'need to rationalize conflicting info'" because "'all agree [TPS] must end.'" *Id*. at 324 (citations omitted, alterations in original). Ultimately, the Court concluded that the plaintiffs had "proffered significant evidence based on hard facts" that "the Government's decision was pretextual," with the evidence "tending to show DHS, USCIS, and the Department of State reverse engineered the TPS process with the principal aim of 'getting to no.'" *Id*. at 343. Put simply: "[T]he

reasons motivating [Acting Secretary Duke's] decision were not those articulated in the Federal Register Notice. *Id*. at 361–62.

64.    As to the plaintiff's Equal Protection claim, the Court found that the evidence showed "direct evidence of direct communications and involvement between the White House and DHS in formulating the decision to terminate Haiti's TPS." 375 F. Supp. 3d at 369. The Court found that those communications "reveal[ed] the intent to formulate a general policy of terminating TPS for predominantly non-white foreign countries in order to decrease the presence of non-white immigrants in the United States." 375 F. Supp. 3d at 374. The Court observed that "[u]nlike prior decisions on TPS, the White House was not only involved in but was influential in producing the decision to terminate TPS for Haiti." *Id*. The White House's influence on the TPS decision-making process, coupled with President Trump's repeated invective against Haitians in particular and immigrants generally, caused the Court to conclude that

> [b]ased on the facts on this record, and under the factors prescribed by [the Supreme Court's decision in] *Arlington Heights*, there is both direct and circumstantial evidence a discriminatory purpose of removing non-white immigrants from the United States was a motivating factor behind the decision to terminate TPS for Haiti.

*Id*. at 374.

65.    The government appealed this Court's ruling, but before the Second Circuit issued its ruling, Secretary Mayorkas designated Haiti for TPS in August 2021. 86 Fed. Reg. 41863 (Aug. 3, 2021). This mooted the case, and the parties agreed to a stipulated dismissal.

### *President Trump Promises to End Haiti's TPS, Suggesting He Prefers White Immigrants to Nonwhite Immigrants*

66.    During his 2024 presidential campaign, President Trump made numerous statements demonstrating suggesting a discriminatory animus against Haitians in particular, and nonwhite immigrants generally based on their perceived race, ethnicity, and national origin. Some of these statements are described below.

67.     President Trump compared immigrants to snakes.[15]

68.     President Trump said that immigrants are "poisoning the blood" of America.[16]

69.     President Trump said that immigrants are "not people."[17]

70.     In the fall of 2024, Haitian TPS holders in particular entered President Trump's rhetorical crosshairs. Over the past several years, thousands of Haitian TPS holders moved to Springfield, Ohio. The reason is simple: Although "[t]housands of new jobs had been created there, thanks to a successful effort by the city's leadership and Chamber of Commerce to attract new business to Springfield," the City's population "had dwindled to under 60,000, from about 80,000 in the late 1960s and early 1970s," which left local employers without enough native-born workers to fill the new jobs.[18] Meeting that need, Haitian TPS holders have helped power Springfield's economic recovery.

71.     President Trump seized on Springfield's influx of Haitians to knowingly spread a vicious lie: that Haitian TPS holders were stealing Springfield residents' house pets, cooking them, and eating them. At the September 10, 2024, presidential debate, President Trump falsely asserted that in

---

[15]  *See, e.g.*, Dara Lind, *"The Snake": Donald Trump brings back his favorite anti-immigrant fable at CPAC* (Feb. 23, 2018), https://www.vox.com/policy-and-politics/2018/2/23/17044744/trump-snake-speech-cpac; John T. Bennett, *'Dumping ground': Trump echoes conservative 'Project 2025' at first rally as a felon*, ROLL CALL (June 10, 2024), https://rollcall.com/2024/06/10/dumping-ground-trump-echoes-conservative-project-2025-at-first-rally-as-a-felon/.

[16]  C-Span, *Donald Trump on Illegal Immigrants "Poisoning the Blood of Our Country,"* https://www.c-span.org/clip/campaign-2024/donald-trump-on-illegal-immigrants-poisoning-the-blood-of-our-country/5098439; Hannah Fingerhut and Ali Swenson, *Trump defends controversial comments about immigrants poisoning the nation's blood at Iowa Rally*, ASSOCIATED PRESS (December 19, 2023), https://apnews.com/article/donald-trump-immigration-iowa-dff7f632948fa6511fb7d1955a28610c.

[17]  Will Weissert and Jill Colvin, *Why Trump's alarmist message on immigration may be resonating beyond his base*, ASSOCIATED PRESS (Apr. 1, 2024), https://apnews.com/article/border-immigration-trump-biden-rhetoric-2024-election-327c08045edcc200f850d893de6a79d6.

[18]  Miriam Jordan, *Why Thousands of Haitians Have Settled in Springfield, Ohio*, N.Y. TIMES (Sept. 14, 2024), https://www.nytimes.com/2024/09/14/us/haitian-migrants-springfield-ohio.html.

Springfield, [Haitian immigrants are] eating the dogs. The people that came in. They're eating the cats. They're eating -- they're eating the pets of the people that live there. And this is what's happening in our country.[19]

72.    President Trump's campaign against Haitian TPS holders did not stop there. In an interview on October 8, 2024, he stated, "I mean, look at Springfield, where 30,000 illegal immigrants are dropped, and it was, they may have done it through a certain little trick, but they are illegal immigrants as far as I'm concerned."[20] Indicative of President Trump's disregard for the law, the "little trick" to which he derisively referred was nothing less than a duly enacted statute—8 U.S.C. § 1254a, which established TPS.

73.    Two days later, President Trump said that immigrants from Haiti all "probably have AIDS," a slur that he has wielded numerous times in his political career.[21] In fact, a similar statement—that "Haitians 'all have AIDS'"—was cited by this Court as evidence of President Trump's animus in *Saget*. 375 F. Supp. 3d at 371.

74.    President Trump's invective during the 2024 campaign was not limited to Haitians but directed at other predominantly nonwhite immigrants as well. In an interview with *Time* Magazine in 2024, President Trump compared immigration to an "invasion like probably no country has ever seen before."[22]

75.    Reflecting his obsession with their physical traits and national origins, President Trump lamented the presence of immigrants from predominantly nonwhite regions of the world:

They come from Africa. They come from Asia. They come from all over the world. They come from the Middle East, Yemen ... Large numbers of people are coming

---

[19]    Riley Hoffman,    *READ: Harris-Trump presidential debate transcript*, ABC News (Sept. 10, 2024), https://abcnews.go.com/Politics/harris-trump-presidential-debate-transcript/story?id=113560542.

[20]    Edith Olmsted, *Trump Escalates Racist Attacks With Dangerous Lie*, THE NEW REPUBLIC (Oct. 9, 2024), https://newrepublic.com/post/186961/donald-trump-racist-attacks-springfield-ohio-lie.

[21]    *Trump Slams Haitians attempting to enter U.S., says they 'probably have AIDS*,' ABC 7 (Oct. 10, 2024), https://abc7.com/haitian-migrants-attempting-enter-president-immigration/11108741/.

[22]    Time Staff, *Read the Full Transcripts of Donald Trump's Interviews With TIME*, TIME (Apr. 30, 2024), https://time.com/6972022/donald-trump-transcript-2024-election/.

in from China.… And if you look at these people, did you see them? They are physically fit. They're 19 to 25. Almost everyone is a male, and they look like fighting age.[23]

76.    Throughout his recent campaign, President Trump denigrated and vilified nonwhite immigrants from across the world. In an interview with NewsNation in October 2024, he asserted:

It's not just South America, it's all over the world. They're coming in from Africa, they're coming in from the Congo. They are coming in from all parts of South America … We have people coming in from the Middle East at numbers we have never seen. They are coming in from Asia. And it's not sustainable by us or any country… We have drug dealers, the biggest drug dealers. We have terrorists, we have everybody.[24]

77.    Consistent with his animus toward nonwhite immigrants, President Trump portrays the areas in which they settle in the United States as "dumping grounds" that are "destroying our country."[25]

78.    Importantly, President Trump does not describe immigrants from other—predominantly white—countries this way.  For example, during the 2024 campaign he asked rhetorically:

Why can't we allow people to come in from nice countries… you know like Denmark, Switzerland? Do we have any people coming in from Denmark? How about Switzerland? How about Norway?[26]

---

[23]    Alexandra Hutzler, *Trump continues to demonize migrants, falsely claims they're 'building an army'*, ABC NEWS (May 24, 2024), https://abcnews.go.com/Politics/trump-continues-demonize-migrants-falsely-claims-building-army/story?id=110535732

[24]    Damita Menezes and Ali Bradley, *Trump on Springfield Haitian migrants: 'They have to be removed'*, NEWSNATION (Oct. 2, 2024), https://www.newsnationnow.com/politics/2024-election/trump-springfield-haitian-migrants-removed/.

[25]    John T. Bennett, '*Dumping ground': Trump echoes conservative 'Project 2025' at first rally as a felon*, ROLL CALL (June 10, 2024), https://rollcall.com/2024/06/10/dumping-ground-trump-echoes-conservative-project-2025-at-first-rally-as-a-felon/.

[26]    Maggie Haberman & Michael Gold, *Trump, at Fund-Raiser, Says He Wants Immigrants From "Nice" Countries*, N.Y. TIMES (April 7, 2024), https://www.nytimes.com/2024/04/07/us/politics/trump-immigrants-nice-countries.html.

79.     President Trump's disparaging statements about immigrants from certain countries is nothing new. In his 2016 campaign's kick-off speech, President Trump disparaged Latin American immigrants:

> When Mexico sends its people, they're not sending their best…. They're sending people that have lots of problems, and they're bringing those problems with us. They're bringing drugs. They're bringing crime. They're rapists.[27]

80.     After taking office, in a White House meeting with U.S. Senators on January 11, 2018, President Trump disparaged an immigration plan that protected people from predominantly nonwhite nations, including Haiti, El Salvador, and several African nations, asking, "Why are we having all these people from shithole countries come here?"[28]

81.     In the same meeting, he targeted Haitians specifically, asking, "Why do we need more Haitians?"[29]

82.     He later added the United States should welcome more immigrants from predominantly white Norway.[30]

### *President Trump's Surrogates' Discriminatory Statements About Immigrants, Especially Nonwhite Ones*

83.     Other members of the administration have likewise made statements that betray an animus against immigrants from predominantly nonwhite countries.

84.     Secretary Noem herself has expressed such views. For example, on July 17, 2024, Secretary Noem posted on Instagram:

---

[27]  *Full Text: Trump announces a presidential bid*, WASH. POST (June 16, 2015), https://www.washingtonpost.com/news/post-politics/wp/2015/06/16/full-text-donald-trump-announces-a-presidential-bid/?utm_term=.6fa0170ce812

[28]  *Saget*, 375 F. Supp. 3d at 371.

[29]  Ali Vitali, *Trump referred to Haiti and African nations as 'shithole' countries*, NBC NEWS (Jan. 12, 2018), https://www.nbcnews.com/politics/white-house/trump-referred-haiti-african-countries-shithole-nations-n836946.

[30]  *Id.*

Everyday Americans are losing their loved ones, every single day, because we are allowing dangerous criminals, unstable mental people [into the United States].… We are not getting the best of the best."[31]

85.    Secretary Noem claims that immigrants come to the United States to "break our laws, rape our women, and murder our children."[32]

86.    Secretary Noem has described immigrants as "dirtbags."[33]

87.    President Trump's Deputy Chief of Staff and Homeland Security Advisor, Stephen Miller, is a "key architect of [President Trump's] immigration policies."[34] Miller has a well-documented history of animus against nonwhite immigrants.

88.    As a senior advisor in the first Trump administration, he repeatedly called DHS officials to pressure them into terminating multiple countries' TPS designations.[35]

89.    In emails, Miller has promoted the works of Jared Taylor, "a self-described 'white advocate'" who as "editor of the white nationalist magazine American Renaissance" has written that "newcomers are not the needy; they are the greedy."[36]

90.    Miller has also repeatedly praised "the Coolidge-era immigration law, which," enacted in 1924, "ushered in 40 years of lowered immigration levels with discriminatory quotas aimed at southern and Eastern Europeans, whom critics at the time attacked as nonwhite."[37]

---

[31]    Kristi Noem (@kristinoem), INSTAGRAM, https://www.instagram.com/kristinoem/reel/DCIV983xbLS/?hl=en (last visted Feb. 23, 2025).

[32]    *Id.*

[33]    Kristi Noem, Kristi Noem (@Sec_Noem), X (Jan. 28, 2025, 7:35 AM), https://x.com/Sec_Noem/status/1884264039158800547.

[34]    Elliot Spagat, *Trump picks a pair of experienced advisers motivated to carry out his immigration crackdown*, ASSOCIATED PRESS (Nov. 12, 2024), https://apnews.com/article/immigration-deportation-homan-miller-trump-border-abb1a75497d11c978c369cb20016eecb.

[35]    *Ramos v. Nielsen*, 336 F.Supp.3d 1075, 1098 (N.D. Cal. 2018).

[36]    Katie Rogers & Jason DeParle, *The White Nationalist Websites Cited by Stephen Miller*, N.Y. TIMES (Nov. 18, 2019), https://www.nytimes.com/2019/11/18/us/politics/stephen-miller-white-nationalism.html

[37]    *Id.*

91.     Miller has recommended that others read "the French novel *The Camp of the Saints*, which dramatizes the apocalyptic scenario of Europe being overwhelmed by nonwhite immigration, leading to the end of civilization."[38]

### *The Trump Administration's Pre-Ordained Agenda to End TPS for Haiti*

92.     As explained above (*supra* ¶¶ 22-32), the TPS statute authorizes ending a TPS designation only after "consultation with appropriate agencies of the Government" (8 U.S.C. § 1254a(b)(1)), and only after an evidence-based review process. *Id*. at §§ 1254a(b)(1)(C), (b)(3)(B).

93.     Contrary to this statutorily mandated framework, President Trump and his surrogates made the decision to end TPS before they took office, well before he or anyone in his administration could have consulted with any government agency, let alone undertaken the statutorily prescribed review process.

94.     Indeed, on the campaign trail, President Trump repeatedly said that if elected he and his administration would end Haiti's TPS.

95.     For example, at a campaign rally on September 13, 2024—just days after his fact-free accusation that Haitian TPS holders in Springfield were stealing and eating pets—President Trump said, "We will do large deportations in Springfield, Ohio."[39]

96.     On October 2, 2024, a reporter asked President Trump whether he would end TPS for Haiti if elected to a second term. President Trump responded unambiguously: "Absolutely I'd revoke it, and I'd bring them back to their country."[40]

---

[38]    Adam Serwer, *Trump's White Nationalist Vanguard*, THE ATLANTIC (Nov. 19, 2019), https://www.theatlantic.com/ideas/archive/2019/11/stephen-miller-alarming-emails/602242/

[39]    *Former President Trump Holds News Conference Near Los Angeles*, C-SPAN (Sept. 13, 2024) https://www.c-span.org/program/campaign-2024/former-president-trump-holds-news-conference-near-los-angeles/648784.

[40]    Maggie Astor, *Trump Says He Would Try Again to Revoke Haitian Immigrants' Protections*, N.Y. TIMES (Oct. 3, 2024), https://www.nytimes.com/2024/10/03/us/politics/trump-haitian-immigrants-legal-status.html.

97.     Signaling in advance that a second Trump administration was determined to end TPS designations without regard to the law, now-Vice President Vance, falsely describing TPS holders as "illegal aliens" even though they are currently in the country legally, declared during the campaign that "[w]e're going to stop doing mass grants of Temporary Protected Status," despite the statute, by design, granting blanket relief to all citizens of a designated country present in the United States on the date of designation.[41]

98.     Vice President Vance admitted that he had intentionally made up the "debunked claims" that Haitian TPS holders were eating pets, saying that he was willing "to create stories" to advance President Trump's anti-immigrant agenda.[42]

99.     Secretary Noem too expressed a generalized hostility to TPS designations before taking office. When asked a question about TPS in her confirmation hearing, she answered, "[TPS] has been abused and manipulated by the Biden administration, and that will no longer be allowed[,] … these extensions going forward the way that they are."[43]

100.     Secretary Noem has made clear that her decisions to end TPS for Haiti and other countries are based not on the statutorily required review process, nor on any consultation with government agencies, but on President Trump's directive to end TPS. Concerning her decision to terminate TPS for Venezuela, for example, Secretary Noem said, "[w]hen the President gives a directive, the Department of Homeland Security will follow it."[44]

---

[41]    Chris Cameron, *Vance Vows an End to Programs for Legal Immigrants*, N.Y. TIMES (Oct. 22, 2024), https://www.nytimes.com/2024/10/22/us/politics/vance-trump-legal-immigrants.html.

[42]    Maggie Astor, *Vance Sticks By Pet-Eating Claims and Says He's Willing to 'Create Stories,'* N.Y. TIMES (Sept. 15, 2024), https://www.nytimes.com/2024/09/15/us/politics/jd-vance-springfield-pets.html.

[43]    *Homeland Security Secretary Nominee Governor Kristi Noem Testifies at Confirmation Hearing*, C-SPAN (Jan. 17, 2025) https://www.c-span.org/program/senate-committee/homeland-security-secretary-nominee-gov-kristi-noem-testifies-at-confirmation-hearing/654484.

[44]    Kristi Noem (@Sec_Noem), X (Jan. 29, 2025), https://x.com/sec_noem/status/1884752724194963594?s=46&t=DFMGDqrcqeJ4X9klKmN2s (last visited Feb. 23, 2025).

101.    These public statements by President Trump, his surrogates, and his political allies are evidence that, as in the first Trump administration, the decision to end Haiti's TPS designation was preordained decision rather than a product of the statutorily mandated review process.

### *The Trump Administration's February 20, 2025 "Partial Vacatur" of Haiti's TPS Designation*

102.    On January 20, 2025, President Trump was sworn in as President of the United States.

103.    That same day, he issued an Executive Order titled "Protecting the American People Against Invasion." The Order directed his new administration to "take all appropriate action, consistent with law, to rescind the policy decisions of the previous administration that led to the increased or continued presence of illegal aliens in the United States, and align any and all departmental activities with the policies set out by this order and the immigration laws."[45]

104.    The Executive Order specifically required that TPS designations be "appropriately limited in scope."[46]

105.    On January 25, 2025, Kristi Noem was sworn in as DHS Secretary.

106.    As promised, Secretary Noem, at the directive of President Trump, issued what she styled a "partial vacatur" of Haiti's TPS designation on February 24, 2025. 90 Fed. Reg. 10511, 10511 (Feb. 24, 2025). Contrary to statute, which prohibits termination of a country's TPS designation before the date on which it was scheduled to expire (8 U.S.C. § 1254a(b)(3)(B)), the notice purports to terminate Haiti's TPS designation as of "August 3, 2025, instead of February 3, 2026," its previously fixed expiration date. 90 Fed. Reg. at 10511.

---

[45]    Exec. Order 14159 (Jan. 20, 2025), *available at* https://www.whitehouse.gov/presidentialactions/2025/01/protecting-the-american-people-against-invasion/.
[46]    *Id*.

107. According to the termination notice, Secretary Noem acted "[i]n furtherance of" the objectives set forth in President Trump's executive order entitled "Protecting the American People Against Invasion," which she characterized as directing her "to promptly take all appropriate actions, consistent with law, to rescind policies that led to increased or continued presence of illegal aliens in the United States." 90 Fed. Reg. at 10513. The notice offers no explanation—and can offer no valid explanation—why premature termination of Haiti's TPS designation in contravention of 8 U.S.C. § 1254a(b)(3)(B) is, supposedly, "consistent with law."

108. Secretary Noem does not claim that her premature termination of Haiti's TPS designation is a product of the mandatory review process set forth in 8 U.S.C. § 1254a(b)(3). The termination notice does not claim that Secretary Noem "consult[ed] with appropriate agencies of the Government." *Id.* § 1254a(b)(3)(A). Nor does it claim that she "review[ed] the conditions in" Haiti, let alone "determined whether the conditions for [Haiti's] designation … continue to be met." *Id.*

109. Had she consulted with the relevant agencies, she would have learned from the State Department that "humanitarian, security, and political crises" continue to grip Haiti and that people should "not travel to Haiti due to kidnapping, crime, civil unrest, and limited health care."[47] Indeed, she would have learned that U.S. "[e]mbassy employees are prohibited from using public transportation and visiting certain areas of Port-au-Prince due to high crime."[48] She also would have learned that, as Secretary of State Rubio recently stated, the current multinational force

---

[47]    U.S. Dept. State, U.S. Relations with Haiti, https://www.state.gov/u-s-relations-with-haiti/ (Jan. 20, 2025); Haiti Travel Advisory (Sept. 18, 2024), https://travel.state.gov/content/travel/en/traveladvisories/traveladvisories/haiti-travel-advisory.html.

[48]    U.S. Embassy in Haiti, Information for Travelers, https://ht.usembassy.gov/u-s-citizen-services/local-resources-of-u-s-citizens/information-for-travelers/#:~:text=Political%20violence%20and%20violent%20crimes,%2Dau%2DPrince%20international%20airport

deployed in Haiti to restore order "will not be enough" to "be successful at rooting out armed groups that today have taken possession of large portion[s] of Haitian territory."[49]

110.    Rather than make any determinations with respect to the conditions in Haiti or the national interest of the United States, Secretary Noem merely criticized her predecessor's most recent extension and redesignation decision. According to Secretary Noem, "partial vacatur" of the July 1, 2024, extension and redesignation—which extended Haiti's TPS designation to February 3, 2026—was warranted because, in her view, it (1) contained "no discussion … of why the 18-month period was selected"; (2) lacked "justification of why permitting the ever-increasing population of Haitian TPS recipients … to remain temporarily in the United States is not contrary to the U.S. national interest"; and (3) cited country conditions reports that "[d]ate back to early 2023" or earlier. 90 Fed. Reg. at 10513.

111.    Despite her criticisms of the July 1, 2024, extension and redesignation, Secretary Noem did not do what the statute requires before terminating Haiti's TPS designation. She did not determine that it was now possible for Haitian TPS holders to return to Haiti "in safety"; nor did she determine that the presence of Haitian TPS holders is "contrary to the national interest." 8 U.S.C. § 1254a(b)(3). Put simply: the Secretary made no determination under the TPS statute.

112.    Rather than engage in the statutorily specified procedure for terminating a country's TPS designation, Secretary Noem purports to have "partially vacate[d]" the existing designation. 90 Fed. Reg. at 10511. But the TPS statute does not contemplate vacatur of an existing designation. To the contrary, because the statute specifies a particular termination procedure, the Secretary may not bypass that procedure, whether by styling her decision a "vacatur" or otherwise.

---

[49]    Agence France Presse, *Rubio Says US Backs Haiti Mission But More Needed*, Barron's (Feb. 6, 2025), https://www.barrons.com/news/rubio-says-us-backs-haiti-mission-but-more-needed-a4c80ae9.

113.    Ignoring duly enacted law, Secretary Noem prematurely terminated Haiti's TPS designation at the behest of President Trump.[50] Instead of giving due consideration to the statutorily identified factors after consultation with the appropriate agencies, she reached a predetermined decision, having earlier announced that "[w]hen the President gives a directive [to end a TPS designation], the Department of Homeland Security will follow it."[51]

114.    Rather than disavow Secretary Noem's unlawful premature termination of Haiti's TPS designation, President Trump has endorsed it, boasting that "we are getting them out and getting them out fast."[52]

### *The Extraordinary Harms Haitian TPS Holders Will Suffer Because of the Premature Termination*

115.    Plaintiffs and other Haitian TPS holders have been and will be harmed by the premature termination of Haiti's TPS designation in numerous ways. Some examples of those harms are described immediately below.

116.    Plaintiff Sabina Badio Florial will suffer and has suffered significant harm as a result of the Trump administration's decision to prematurely terminate Haiti's TPS. She will lose her work authorization on the effective date of the termination, and because she and her husband are both TPS holders they will both lose their right to work, which in turn would make them unable to make car, house, and credit card payments. She is terrified at the prospect of returning to Haiti, particularly in light of the gang violence. She fears she would not be able to find a job in Haiti. And even if she were to work as a street vendor in Haiti—as many do to make ends meet—

---

[50]    Kristi Noem (@Sec_Noem), X (Jan. 29, 2025), https://x.com/sec_noem/status/1884752724194963594?s=46&t=DFMGDqrcqeJ4X9klKmN2s ("When the President gives a directive, the Department of Homeland Security will follow it.") (last visited Feb. 23, 2025).

[51]    Interview with Krisi Noem, Homeland Security Secretary, CNN (January 29, 2025), https://transcripts.cnn.com/show/cnc/date/2025-01-29/segment/12

[52]    *Full Transcript of President Trump's Speech to Congress*, N.Y. TIMES (March 5, 2025), https://www.nytimes.com/2025/03/04/us/politics/transcript-trump-speech-congress.html.

she understands that gangs target vendors and rob them. She has a personal connection to the violence in Haiti—about two years ago her brother was shot; the bullet is still lodged in his arm. And, because she has a family history of cancer, she is fearful that she may develop cancer later in life and not be able to access proper medical care in Haiti.

117.    Plaintiff Youdelaine Dorcin will suffer and has suffered significant harm as a result of the Trump administration's decision to prematurely terminate Haiti's TPS. She will lose her employment authorization on the effective date of the TPS termination, making her unable to work and support herself financially. She fears that if she is returned to Haiti because she is a young woman and she understands that gangs target young women for rape and, because she has spent time in the United States, for kidnapping and ransom. She would not have anyplace to live if she had to return to Haiti. She has high blood pressure and takes medication, Pravastatin, to treat it; if she had to return to Haiti she would not be able to obtain this medication, let alone pay for it.

118.    Plaintiff Robert Jean Alix Erinac will suffer and has suffered significant harm as a result of the Trump administration's decision to prematurely terminate Haiti's TPS. Putting aside the reality that he would lose his job as a bus driver, he has a life-threatening medical condition. He was diagnosed in October 2024 with a malignant tumor in his stomach that has spread to his pancreas and liver. He has been prescribed a drug, Imatinib, which he takes daily, to hopefully shrink the tumor to the point where it can be removed surgically. If he had to return to Haiti he would not be able to access this potentially life-saving care.

119.    Plaintiff R Marie Wildrigue Erinac Miot, Robert's wife, will suffer and has suffered significant harm as a result of the Trump administration's decision to prematurely terminate Haiti's TPS. She will lose her job as a registered nurse on the effective date of the termination.

She fears that Robert will not be able to obtain the potentially life-saving cancer treatment he requires in Haiti. And if she is forced to return to Haiti she will be faced with the impossible choice of whether to take her children—all U.S. citizens—with her, thus subjecting them to potential kidnapping and death at the hands of gangs. Worse, her youngest child—who is two years old—has severe allergies to peanuts and dairy products. If her child comes into contact with peanuts or dairy, she suffers severe anaphylaxis requiring an EpiPen for immediate treatment. Ms. Erinac Miot worries that if her child suffers an allergic reaction in Haiti—where epinephrine is not available—her child will die.

120.    Plaintiff Rachelle Guirand will suffer and has suffered significant harm as a result of the Trump Administration's decision to prematurely terminate Haiti's TPS. In addition to losing her work authorization, which would make her unable to continue to work, If Ms. Guirand is deported, she will be faced with the excruciating decision which will face all Haitians with TPS who have U.S.-born children—whether to bring her son with her to Haiti, thereby depriving him of his right as an American to live in safety in the United States, or instead to leave him behind in the United States in the care of someone else for the sake of his own future and physical safety, but separating him from and depriving him of his mother.

121.    Plaintiff Dieu Yolnick Jeune Cadet will suffer and has suffered significant harm as a result of the Trump Administration's decision to prematurely terminate Haiti's TPS. She will lose her work authorization on the effective date of the termination, making her unable to provide financially for her children. She worries that she would be homeless if she is unable to work, since she has no other way to support her family. Worse, her youngest child suffers from schizophrenia, requiring extensive medical care and medication—and if she and her children were forced to

return to Haiti her child would be unable to access this medication. She also fears for her physical safety, worried that if she returns to Haiti she will be targeted by gangs for rape and murder.

122.    Plaintiff Audoine Amazan will suffer and has suffered significant harm as a result of the Trump administration's decision to prematurely terminate Haiti's TPS. If he is forced to return to Haiti, he understands he might be targeted by gangs and that he cannot seek protection from the police because the police are themselves gang-affiliated. He takes medication for high blood pressure and he would not be able to access that medication in Haiti.

123.    Plaintiff Gerald Michaud will suffer and has suffered significant harm as a result of the Trump Administration's decision to prematurely terminate Haiti's TPS. He will lose his job and his ability to support his family on the effective date of TPS's termination. He fears the violence in Haiti and fears returning. He knows people who have been personally affected by the violence: his older brother's friend was kidnapped and held for ransom by a gang, and his older brother had to pay the ransom. And a friend of his was kidnapped and held for ransom. These experiences make him especially afraid because he knows that gangs target people like him who have spent time in the United States; he thinks there is a good chance he would be killed. He does not know how he or his family would get enough food to eat if he had to return.

124.    Plaintiff Nadege Joseph Michaud, Gerald's wife, will suffer and has suffered significant harm as a result of the Trump Administration's decision to prematurely terminate Haiti's TPS.  She will lose her job on the effective date of the termination. She fears the gangs that have overtaken the country: her father and his wife had to flee the area of Haiti in which they lived, as did her cousin. Her other cousin had to abandon her home when gangs took over the part of Haiti in which she lived; now her cousin lives on the streets. Ms. Michaud understands that the police in Haiti have less power than the gangs themselves, and so she would not be able to go to

the police for protection. She is anemic and would not be able to obtain her medication in Haiti. Her father also had anemia and was unable to access medical care in Haiti, so she fears the same would happen to her.

125.    Plaintiff Haitian Evangelical Clergy Association (HECA) will suffer and has suffered significant harm as a result of the Trump administration's decision to prematurely terminate Haiti's TPS. Indeed, the decision to terminate TPS early has already negatively impacted HECA. HECA and its member churches rely on offerings and donations from parishioners in order to stay afloat financially. Those offerings and donations—which were already dramatically reduced due to diminishing in-person church attendance during the COVID-19 pandemic—have decreased even further as a result of the TPS termination decision.  Because of the early termination of TPS, many TPS-holding parishioners are afraid to participate in society and are staying home from church rather than participating in services. And, with fewer parishioners in the pews, HECA and its member churches have been harmed financially due to a reduction in donations and offerings. Indeed, if enough Haitian TPS holders continue to not attend services, one or more or HECA's member churches may be forced to close their doors for good.

126.    Plaintiff SEIU Local 32BJ will suffer and has suffered significant harm as a result of the Trump administration's decision to prematurely terminate Haiti's TPS. The early termination of Haiti's TPS has already forced, and will continue to force, SEIU Local 32BJ to expend its resources advising its members—through the distribution of literature or through in-person advising—about their contractual rights in the workplace (for example, if an employer seeks to terminate a member's employment prior to August 3, 2025).  Further, having fewer Haitian TPS-holder members will adversely affect SEIU Local 32BJ political advocacy; having the voices of these members as part of SEIU Local 32BJ lends credibility to its policy and political

positions on immigration—without these members, SEIU Local 32BJ will not be as effective in its advocacy. And, like all labor unions, SEIU Local 32BJ relies on dues paid by its members to survive financially. Accordingly, the early termination of TPS for Haiti will have cascading economic effects on SEIU Local 32BJ directly, because SEIU Local 32BJ will have fewer dues-paying members following the effective date of the termination on August 3, 2025.

## CLAIMS FOR RELIEF

### *Count One*

### (Violation of the Administrative Procedure Act)

127. The allegations in paragraphs 1-126 are incorporated by reference as if fully set forth herein.

128. The Administrative Procedure Act (APA), 5 U.S.C. § 701 *et seq*., ensures that federal agencies are accountable to the public by providing a "right of review" to any person "suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action." 5 U.S.C. § 702.

129. The APA directs federal courts to "hold unlawful and set aside agency action" that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," 5 U.S.C. § 706(2)(A); "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right," *id*. § 706(2)(C); or "without observance of procedure required by law," *id*. § 706(2)(D).

130. On February 20, 2025, purporting to "partially vacate" the agency's July 1, 2024, extension of Haiti's designation through February 3, 2026, Defendants declared that Haiti's designation will now terminate on August 3, 2025, six months before the previously fixed expiration date. 90 Fed. Reg. 10511, 10511 (Feb. 24, 2025).

131.    Defendants' premature termination of Haiti's TPS designation violates the APA in multiple ways, each of which is an independent basis for setting it aside under 5 U.S.C. § 706.

132.    Defendants' premature termination of Haiti's TPS designation violates 8 U.S.C. § 1254a(b)(3)(B), which bars termination of a country's TPS designation before its previously set expiration date. Defendants' action is therefore "in excess of statutory … authority" and "not in accordance with law." 5 U.S.C. §§ 706(2)(A), (C).

133.    Defendants not only prematurely terminated Haiti's TPS designation in contravention of 8 U.S.C. § 1254a(b)(3)(B) but, in violation of 8 U.S.C. § 1254a(b)(3), did so without undertaking the statutorily mandated review process that must precede any termination. Secretary Noem neither "consult[ed] with appropriate agencies of the Government" nor "determine[d] whether the conditions for [Haiti's TPS] designation … continue to be met" after "review[ing] the conditions in" Haiti," all of which the Secretary "shall" do before terminating a country's TPS designation. *Id.* § 1254a(b)(3)(A). Terminating Haiti's TPS designation without having engaged in the mandatory process is not only "in excess of statutory … authority" and "not in accordance with law" but also "without observance of procedure required by law." 5 U.S.C. §§ 706(2)(C), (D).

134.    Because Congress has specified by statute the process that must be followed before a TPS designation may be terminated (*see* 8 U.S.C. § 1254a(b)(3)), the Secretary lacks inherent authority to vacate or rescind a prior designation outside that procedure.

135.    Prematurely terminating Haiti's TPS designation without reviewing the conditions in Haiti and without making an evidence-based determination based on those conditions as required by 8 U.S.C. §§ 1254a(b)(3)(A)–(B) is "arbitrary, capricious, [and] an abuse of discretion." 5 U.S.C. § 706(2)(A).

136.    The preordained premature termination of Haiti's TPS designation is also "arbitrary, capricious, [and] an abuse of discretion" and "contrary to constitutional right" (5 U.S.C. §§ 706(2)(A), (B)) inasmuch as it is animated in significant part by discriminatory animus toward Haitians and other nonwhite immigrants.

137.    Defendants' premature termination of Haiti's TPS designation constitutes final agency action. *See* 5 U.S.C. § 704 (providing that judicial review of APA claims is generally limited to "final agency action for which there is no other adequate remedy in a court").

138.    In short, Defendants' premature termination of Haiti's TPS designation is arbitrary and capricious; an abuse of discretion; not in accordance with the law; in excess of statutory authority; and undertaken without observance of procedure required by law. It must therefore be "held unlawful and set aside." 5 U.S.C. § 706(2).

### <u>Count Two</u>

### (Violation of the Due Process Clause)

139.    The allegations in paragraphs 1-126 are incorporated by reference as if fully set forth herein.

140.    The Due Process Clause of the Fifth Amendment to the Constitution prohibits the federal government, including Defendants, from depriving individuals of "life, liberty or property, without due process of law." U.S. Const. amend. V.

141.    Unable to safely return to Haiti and having built lives in this country in reliance on 8 U.S.C. § 1254a, Haitian TPS holders have life, liberty, and property interests in remaining in the United States unless and until Haiti's TPS designation is lawfully terminated.

142.    Defendants' premature termination of Haiti's TPS designation violates TPS holders' constitutional right to procedural and substantive due process.

143.    Defendants prematurely terminated Haiti's TPS designation outside the statutorily specified process. Indeed, Haiti's TPS designation was prematurely terminated without any process, let alone due process.

144.    Rather than a result of the statutorily mandated review process, the premature termination of Haiti's TPS designation is, in significant part, a product of President Trump's animus towards immigrants of color in general and Haitians immigrants in particular. Decisions rooted in discriminatory animus are, however, inherently irrational and therefore a violation of substantive due process.

145.    Motivated in significant part by discriminatory animus, the premature termination of Haiti's TPS designation is neither narrowly tailored to a compelling government interest nor rationally related to a legitimate government interest.

146.    Through the actions described above, Defendants have violated Plaintiffs' substantive and procedural due process rights.

## Count Three

### (Violation of the Equal Protection)

147.    The allegations in paragraphs 1-126 are incorporated by reference as if fully set forth herein.

148.    The Due Process Clause of the Fifth Amendment to the Constitution prohibits the federal government, including Defendants, from denying any person equal protection of the laws. *Adarand Constructors, Inc. v. Penã*, 515 U.S. 200, 217–18 (1995); *Bolling v. Sharpe*, 347 U.S. 497, 499–500 (1954).

149.    As demonstrated by President Trump's and Secretary Noem's own words, Defendants' premature termination of Haiti's TPS designation was, at least in part, improperly motivated by animus and discriminatory intent based on race, national origin, and ethnicity.

150.    President Trump's baseless assertion that Haitians are "eating the pets of the people that live [in Springfield, Ohio]" and his insistence that immigrants are "poisoning the blood of our country" bespeak a discriminatory animus that is confirmed by his comparison of predominantly nonwhite "shithole" countries like Haiti to predominantly white "nice countries … like Denmark [and] Switzerland."

151.    Because the premature termination of Haiti's TPS designation was motivated in significant part by discriminatory animus, it is neither narrowly tailored to a compelling government interest nor rationally related to a legitimate government interest.

152.    Accordingly, the action violated Plaintiffs' rights to equal protection of the laws.

## Count Four

### (Excess of Statutory Authority)

153.    The allegations in paragraphs 1-126 are incorporated by reference as if fully set forth herein.

154.    DHS's premature termination of Haiti's TPS designation is *ultra vires*; 8 U.S.C. § 1254a(b)(3)(B) does not permit termination of a TPS designation before its previously fixed expiration date.

155.    DHS's premature termination of Haiti's TPS designation is also *ultra vires* in that 8 U.S.C. §§ 1254a(b)(3)(A)–(B) do not permit termination of a TPS designation without a review of the conditions in Haiti following consultation with the appropriate agencies.

156.    Because it is beyond the Secretary's statutory authority, the premature termination of Haiti's TPS designation should be held unlawful and set aside.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that the Court:

a.    Declare that Defendants' premature termination of Haiti's TPS designation:

(i)    violates the Administrative Procedure Act because it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," "in excess of statutory jurisdiction, authority, or limitations," and "without observance of procedure required by law";

(ii)   violates the Fifth Amendment's guarantee of due process and equal protection; and

(iii)  is in excess of the Secretary's statutory authority;

b.    Set aside the "Partial Vacatur" of Haiti's TPS designation as unlawful;

c.    Award Plaintiffs costs and attorneys' fees; and

d.    Grant such further relief as the Court deems just and proper.

Dated: March 14, 2025

Respectfully Submitted,
/s/ *Andrew Tauber*

Andrew Tauber
Sarah Levine Hartley*
BRYAN CAVE LEIGHTON PAISNER, LLP
1155 F. Street NW, Ste. 700
Washington, D.C. 20004
Phone: (202)-508-6200
andrew.tauber@bclplaw.com
sarah.hartley@bclplaw.com

Geoffrey M. Pipoly*
Alexa Thein*
Madisen Hursey*
BRYAN CAVE LEIGHTON PAISNER, LLP
161 N. Clark Street, Ste. 4300
Chicago, IL 60601
Phone: (312) 602-5000
geoff.pipoly@bclplaw.com
alexa.thein@bclplaw.com
madisen.hursey@bclplaw.com

*Application for *pro hac vice*
admission forthcoming

Ira J. Kurzban
Kevin Gregg*
KURZBAN, KURZBAN, TETZELI & PRATT, P.A.
131 Madeira Ave.
Coral Gables, FL 33134
Phone: (305) 444-0060
ira@kktplaw.com
kgregg@kktplaw.com

Sejal Zota*
Daniel Werner*
Dinesh McCoy*
JUST FUTURES LAW
1629 K Street N.W., Suite 300
Washington, DC 20006
Phone: (617) 812-2822
sejal@justfutureslaw.org
dinesh@justfutureslaw.org
daniel@justfutureslaw.org

*Attorneys for Plaintiffs*