This document is scheduled to be published in the Federal Register on 07/01/2025 and available online at https://federalregister.gov/d/2025-12224, and on https://govinfo.gov

[9111-97]

DEPARTMENT OF HOMELAND SECURITY

U.S. Citizenship and Immigration Services

[CIS No. 2825-25; DHS Docket No. USCIS-2014-0001]

RIN 1615-ZB70

Termination of the Designation of Haiti for Temporary Protected Status

**AGENCY:** U.S. Citizenship and Immigration Services (USCIS), Department of Homeland Security (DHS).

**ACTION:** Notice.

**SUMMARY:** Through this notice, the Department of Homeland Security (DHS) announces that the Secretary of Homeland Security (Secretary) is terminating the designation of Haiti for Temporary Protected Status (TPS). The designation of Haiti is set to expire on August 3, 2025. After reviewing country conditions and consulting with appropriate U.S. Government agencies, the Secretary determined that Haiti no longer continues to meet the conditions for designation for TPS. The Secretary, therefore, is terminating the TPS designation of Haiti as required by statute. This termination is effective [**INSERT DATE 60 DAYS AFTER DATE OF PUBLICATION IN THE FEDERAL REGISTER**]. After [**INSERT DATE 60 DAYS AFTER DATE OF PUBLICATION IN THE FEDERAL REGISTER**], nationals of Haiti (and aliens having no nationality who last habitually resided in Haiti) who have been granted TPS under Haiti's designation will no longer have TPS.

**DATES:** The designation of Haiti for TPS is terminated, effective at 11:59 p.m., local time, on [**INSERT DATE 60 DAYS AFTER DATE OF PUBLICATION IN THE FEDERAL REGISTER**].

**FOR FURTHER INFORMATION CONTACT:** Humanitarian Affairs Division, Office of Policy and Strategy, U.S. Citizenship and Immigration Services, Department of Homeland Security, (240) 721-3000.

**SUPPLEMENTARY INFORMATION:**

**List of Abbreviations**

CFR – Code of Federal Regulations
DHS – U.S. Department of Homeland Security
EAD – Employment Authorization Document
FR – Federal Register
FRN – Federal Register Notice
Government – U.S. Government
INA – Immigration and Nationality Act
Secretary – Secretary of Homeland Security
TPS – Temporary Protected Status
USCIS – U.S. Citizenship and Immigration Services
U.S.C. – United States Code

**What Is Temporary Protected Status (TPS)?**

The Immigration and Nationality Act (INA) authorizes the Secretary of Homeland Security, after consultation with appropriate agencies of the U.S. Government, to designate a foreign state (or part thereof) for TPS if the Secretary determines that certain country conditions exist. *See* INA sec. 244(b)(1), 8 U.S.C. 1254a(b)(1). The Secretary, in her discretion, may grant TPS to eligible nationals of that foreign state (or aliens having no nationality who last habitually resided in the designated foreign state). *See* INA sec. 244(a)(1)(A), 8 U.S.C. 1254a(a)(1)(A).

At least 60 days before the expiration of a foreign state's TPS designation or extension, the Secretary - after consultation with appropriate U.S. Government agencies - must review the conditions in the foreign state designated for TPS to determine whether they continue to meet the conditions for the TPS designation. *See* INA sec. 244(b)(3)(A),

8 U.S.C. 1254a(b)(3)(A). If the Secretary determines that the conditions in the foreign state continue to meet the specific statutory criteria for TPS designation, TPS will be extended for an additional period of 6 months or, in the Secretary's discretion, 12 or 18 months. *See* INA sec. 244(b)(3)(A), (C), 8 U.S.C. 1254a(b)(3)(A), (C). If the Secretary determines that the foreign state no longer meets the conditions for TPS designation, the Secretary must terminate the designation. *See* INA sec. 244(b)(3)(B), 8 U.S.C. 1254a(b)(3)(B). There is no judicial review of "any determination of the [Secretary] with respect to the designation, or termination or extension of a designation of a foreign state" for TPS. INA sec. 244(b)(5)(A), 8 U.S.C. 1254a(b)(5)(A).

TPS is a temporary immigration benefit granted to eligible nationals of a country designated for TPS under the INA, or to eligible aliens without nationality who last habitually resided in the designated country. During the TPS designation period, TPS beneficiaries are eligible to remain in the United States, may not be removed, and are authorized to work and obtain an Employment Authorization Document (EAD) so long as they continue to meet the requirements of TPS. TPS beneficiaries may also apply for and be granted travel authorization as a matter of discretion. The granting of TPS does not result in or lead to lawful permanent resident status or any other immigration status. To qualify for TPS, beneficiaries must meet the eligibility standards at INA section 244(c)(2), 8 U.S.C. 1254a(c)(2) in accordance with the implementing regulations at 8 CFR parts 244 and 1244. When the Secretary terminates a country's TPS designation, beneficiaries return to the same immigration status or category that they maintained before TPS, if any (unless that status or category has since expired or been terminated), or any other lawfully obtained immigration status or category they received while registered for TPS, as long as it is still valid on the date TPS terminates.

**Designation of Haiti for TPS**

Haiti was initially designated for TPS on January 21, 2010, for a period of 18 months, on the basis of extraordinary and temporary conditions in Haiti that prevented nationals of Haiti from returning in safety. *See Designation of Haiti for Temporary Protected Status*, 75 FR 3476 (Jan. 21, 2010). Following the initial designation, TPS for Haiti was extended and newly designated once from July 23, 2011, through January 22, 2013, based on extraordinary and temporary conditions.[1] Thereafter, TPS for Haiti was extended three times based on extraordinary and temporary conditions: (1) from January 23, 2013, through July 22, 2014;[2] (2) from July 23, 2014, through January 22, 2016;[3] (3) from January 23, 2016, through July 22, 2017.[4] The Secretary then granted a six month extension of TPS from July 23, 2017, through January 22, 2018, but made clear that TPS Haiti beneficiaries should prepare for their return to Haiti in the event Haiti's designation was not extended again.[5] Subsequently, the Secretary announced the termination of the TPS designation of Haiti effective July 22, 2019.[6]

The termination of Haiti's 2011 TPS designation was challenged in several lawsuits, and court injunctions required DHS to temporarily continue TPS for Haiti pending a final court order.[7] Former Secretary Mayorkas newly designated Haiti on the basis of extraordinary and temporary conditions effective August 3, 2021, through

---

[1] *See Extension and Redesignation of Haiti for Temporary Protected Status*, 76 FR 29000 (May 19, 2011).

[2] *See Extension of the Designation of Haiti for Temporary Protected Status*, 77 FR 59943 (Oct. 1, 2012).

[3] *See Extension of the Designation of Haiti for Temporary Protected Status*, 79 FR 11808 (Mar. 3, 2014).

[4] *See Extension of the Designation of Haiti for Temporary Protected Status*, 80 FR 51582 (Aug. 25, 2015).

[5] *See Extension of the Designation of Haiti for Temporary Protected Status*, 82 FR 23830(May 24, 2017).

[6] *See Termination of the Designation of Haiti for Temporary Protected Status*, 83 FR 2648 (Jan. 18, 2018).

[7] On December 28, 2023, the U.S. District Court for the Northern District of California dismissed *Ramos v. Nielsen*, 18-cv-01554 (N.D. Cal. Dec. 28,2023). *Bhattarai v. Nielsen*, 19-cv-731 (N.D. Cal. Mar. 12, 2019) was consolidated with *Ramos* in August 2023. The court agreed with the government position that subsequent TPS designations rendered the pending litigation moot.

February 3, 2023.⁸ Thereafter, TPS for Haiti was extended and newly designated effective February 4, 2023, and ending on August 3, 2024.⁹ In July 2024, DHS issued a notice stating that Secretary Mayorkas had once again determined to extend and newly designate Haiti for TPS for an 18-month period, set to expire on February 3, 2026.¹⁰ DHS announced in February 2025 that Secretary Noem had decided to partially vacate the June 2024 decision of Secretary Mayorkas regarding the extension and new designation of Haiti for TPS. Secretary Noem reduced the designation period from the statutory maximum of 18 months to 12 months, providing that the Haiti TPS extension and new designation will now expire on August 3, 2025.¹¹ Secretary Noem's vacatur has been challenged in at least two lawsuits.¹²

**Secretary's Authority to Terminate the Designation of Haiti for TPS**

At least 60 days before the expiration of a foreign state's TPS designation or extension, the Secretary - after consultation with appropriate U.S. Government agencies - must review the conditions in the foreign state designated for TPS to determine whether the country continues to meet the conditions for the TPS designation. *See* INA sec. 244(b)(3)(A), 8 U.S.C. 1254a(b)(3)(A). If the Secretary determines that foreign state no longer meets the conditions for the TPS designation, the Secretary must terminate the designation. *See* INA sec. 244(b)(3)(B), 8 U.S.C. 1254a(b)(3)(B). The termination may not take effect earlier than 60 days after the date the FRN of termination is published, or if later, the expiration of the most recent previous extension of the country designation. *See id*. The Secretary may determine the appropriate effective date of the termination

---

⁸ *See Designation of Haiti for Temporary Protected Status*, 86 FR 41863 (Aug. 3, 2021).

⁹ *See Extension and Redesignation of Haiti for Temporary Protected Status*, 88 FR 5022 (Jan. 26, 2023).

¹⁰ *See Extension and Redesignation of Haiti for Temporary Protected Status*, 89 FR 54484 (July 1, 2024).

¹¹ *See Partial Vacatur of 2024 Temporary Protected Status Decision for Haiti*, 90 FR 10511 (Feb. 24, 2025).

¹² *Haitian American United, Inc. v. Trump*, No. 1:25-cv-10498 (D. Mass); *Haitian Evangelical Clergy v. Trump*, No. 1:25-cv-01464 (D. Md.).

and expiration of any TPS-related documentation, such as EADs, issued or renewed after the effective date of termination. *See id.*; *see also* INA sec. 244(d)(3), 8 U.S.C. 1254a(d)(3) (providing the Secretary the discretionary "option" to allow for a certain "orderly transition" period if she determines it to be appropriate).

**Reasons for the Secretary's Termination of the TPS designation for Haiti**

Consistent with INA section 244(b)(3)(A), 8 U.S.C. 1254a(b)(3)(A), after consulting with appropriate U.S. Government agencies, the Secretary reviewed country conditions in Haiti and considered whether Haiti continues to meet the conditions for the designation under INA section 244(b)(1)(C), 8 U.S.C. 1254a(b)(1)(C). This review included examining (a) whether extraordinary and temporary conditions in Haiti that prevent aliens who are Haitian nationals from returning to Haiti in safety continue to exist, and (b) if permitting Haitian nationals to remain temporarily in the United States is contrary to the national interest of the United States.

"National interest" is an expansive standard that may encompass an array of broad considerations, including foreign policy, public safety (e.g., potential nexus to criminal gang membership), national security, migration factors (e.g., pull factors), immigration policy (e.g., enforcement prerogatives), and economic considerations (e.g., adverse effects on U.S. workers, impact on U.S. communities).[13] Determining whether permitting a class of aliens to remain temporarily in the United States is contrary to the U.S. national interest therefore calls upon the Secretary's expertise and discretionary judgment, informed by her consultations with appropriate U.S. Government agencies.

---

[13] *See, e.g.*, *Poursina* v. *USCIS*, 936 F.3d 868, 874 (9th Cir. 2019) (observing, in an analogous INA context, "that the 'national interest' standard invokes broader economic and national-security considerations, and such determinations are firmly committed to the discretion of the Executive Branch—not to federal courts" (citing *Trump* v. *Hawaii*, 585 U.S. 667, 684-86 (2018)); *Flores* v. *Garland*, 72 F.4th 85, 89-90 (5th Cir. 2023) (same); *Brasil* v. *Sec'y, Dep't of Homeland Sec.*, 28 F.4th 1189, 1193 (11th Cir. 2022) (same); *cf. Matter of D-J-*, 23 I&N Dec. 572, 579-81 (A.G. 2003) (recognizing that taking measures to stem and eliminate possible incentives for potential large-scale migration from a given country is "sound immigration policy" and an "important national security interest"); *Matter of Dhanasar*, 26 I&N Dec. 884, 890-91 (AAO 2016) (taking into account impact on U.S. workers in "national interest" assessments).

Based on her review, the Secretary has determined that termination of TPS for Haiti is required because it is contrary to the national interest to permit Haitian nationals (or aliens having no nationality who last habitually resided in Haiti) to remain temporarily in the United States.

President Trump clearly articulated policy imperatives bearing upon the national interest in his immigration and border-related executive orders and proclamations. In Proclamation 10888 "Guaranteeing the States Protection Against Invasion," President Trump emphasized that Congress has established a complex and comprehensive framework under the INA to regulate the entry and exit of aliens and goods across U.S. borders. Under normal conditions, this framework supports national sovereignty by enabling the admission of aliens whose presence serves the national interest and excluding those who may pose risks to public health, safety, or national security. However, in a high-volume border environment – particularly when the system is overwhelmed – this screening process can become ineffective. Limited access to critical information and significant processing delays hinder the ability of federal officials to reliably assess the criminal histories or national security threats posed by aliens attempting to enter the U.S. illegally. As a result, public safety and national security risks are significantly heightened in such conditions.[14]

In Executive Order (E.O.) 14161 "Protecting the United States From Foreign Terrorists and Other National Security and Public Safety Threats," President Trump instructed the Secretary of State, Attorney General, Secretary of Homeland Security, and Director of National Intelligence to jointly submit to the President a report that identified countries throughout the world "for which vetting and screening information is so deficient as to warrant a partial or full suspension on the admission of nationals from

---

[14] 90 FR 8333.

those countries."[15] In Proclamation "Restricting the Entry of Foreign Nationals to Protect the United States from Foreign Terrorists and Other National Security and Public Safety Threats," President Trump determined to fully restrict and limit the entry of nationals from Haiti following his review of the requested report. In support of this decision, President Trump outlined that "according to the overstay report, Haiti had a B-1/B-2 visa overstay rate of 31.38 percent and an F, M, and J visa overstay rate of 25.05 percent… as is widely known, Haiti lacks a central authority with sufficient availability and dissemination of law enforcement information necessary to ensure its nationals do not undermine the national security of the United States."[16]

In E.O. "Protecting the American People Against Invasion," President Trump underscored that enforcing the immigration laws "is critically important to the national security and public safety of the United States."[17] In furtherance of that objective, the President directed the Secretary, along with the Attorney General and Secretary of State, to promptly take all appropriate action, consistent with law, to rescind policies that led to increased or continued presence of illegal aliens in the United States.[18] Among the directed actions are to ensure that the TPS designations are consistent with the TPS statute and "are appropriately limited in scope and made for only so long as may be necessary to fulfill the textual requirements of that statute."[19]

Prior to FY2025, U.S. Border Patrol recorded a consistent year-over-year increase in encounters with Haitian nationals: 56,596 in FY2022, 163,781 in FY2023, and

---

[15] 90 FR 8451.
[16] 90 FR 24497.
[17] E.O. 14159, *Protecting the American People Against Invasion*, sec. 1, 90 FR 8443, 8443 (Jan. 20, 2025).
[18] *Id.*, sec. 16, 90 FR 8446.
[19] *Id.*, sec. 16(b), 90 FR 8446.

220,798 in FY2024.[20]  For several years, there has been a significant increase in the number of Haitians arriving in the United States irregularly, particularly via land. According to one report, "from 2019 through 2021, Haitians were the top nationality for migrants crossing the dangerous Darien Gap between Colombia and Panama, and they have remained among the three largest groups in 2022 and 2023."[21]  Another report states: "the continuation of a devastating political, environmental, social, and economic situation… in Haiti guarantees an unbroken chain migration, particularly to the United States and Canada; and when combined with already heavy backlogs in processing resident status changes, a large and growing flow of Haitians will persist."[22]  This pattern of large-scale irregular migration as a result of "pull factors" has continued for years.  Yet another report states "misinformation about TPS eligibility and about the general availability of legal status in the United States may have been one factor for migrants trying to reach the U.S. border…"[23]  These realities are unsustainable and inconsistent with President Trump's outlined policy priorities as well as U.S. national interests.

Beyond migration factors and immigration policy, public safety and national security are important considerations when assessing if a TPS designation is in line with U.S. national interests.  DHS records indicate that there are Haitian nationals who are TPS recipients who have been the subject of administrative investigations for fraud, public safety, and national security.  These issues underscore a conflict with the national interest of the United States.

---

[20] U.S. Customs and Border Protection, "U.S. Border Patrol and Office of Field Operations Encounters by Area of Responsibility and Component" (last updated: May 5, 2025), available at: https://www.cbp.gov/newsroom/stats/nationwide-encounters.

[21] Migration Policy Institute, "Haitian Immigrants in the United States" (Nov. 8, 2023), available at: https://www.migrationpolicy.org/article/haitian-immigrants-united-states-2022.

[22] IOM, "Engaging the Haitian Diaspora" (Sept 10, 2013), available at: https://environmentalmigration.iom.int/resources/engaging-haitian-diaspora

[23] Migration Policy Institute, "Haitian Migration through the Americas: A Decade in the Making" (Sept. 30, 2021), https://www.migrationpolicy.org/article/haitian-migration-through-americas.

Gang violence in Haiti persists as armed groups operate with impunity, enabled by a weak or effectively absent central government. The Congressional Research Service described the situation in Haiti in a recent report: "The gangs – some of which are aligned with political elites – amassed control over territory and illicit markets amid political instability following the 2021 assassination of then-President Jovenel Moise. Since April 2024, Haiti has been governed by a Transitional Presidential Council (TPC). The TPC, tasked with governing until elections can be convened, has been plagued by allegations of corruption and infighting."[24] According to Amnesty International, "Haiti is in the grip of severe humanitarian and human rights crisis. Armed gangs are striking the Port-au-Prince metropolitan area and its surroundings with terror and violence, including rape and other forms of sexual violence."[25] On May 2, 2025, the Secretary of State announced the State Department's designation of Viv Ansanm and Gran Grif as Foreign Terrorist Organizations and Specially Designated Global Terrorists. In his announcement, the Secretary noted "Haitian gangs, including the Viv Ansanm coalition and Gran Grif, are the primary source of instability and violence in Haiti. They are a direct threat to U.S. national security interests in our region…their ultimate goal is creating a gang-controlled state where illicit trafficking and other criminal activities operate freely and terrorize Haitian citizens."[26]

Widespread gang violence in Haiti is sustained by the country's lack of functional government authority. This breakdown in governance directly impacts U.S. national

---

[24] Library of Congress, Congressional Research Service, "Haiti in Crisis: Developments Related to the Multinational Security Support Mission" (June 3, 2025), available at: https://www.congress.gov/crs-product/IN12331#:~:text=Between%20January%20and%20March%202025,attributed%20to%20gang%2Drelated%20violence.

[25] Amnesty International, "Gang Violence and Unrest in Haiti," available at: https://www.amnesty.org/en/projects/gang-violence-in-haiti/.

[26] U.S. Department of State, "Terrorist Designations of Viv Ansanm and Gran Grif" (May 2, 2025), available at: https://www.state.gov/releases/office-of-the-spokesperson/2025/05/terrorist-designations-of-viv-ansanm-and-gran-grif/.

security interests, particularly in the context of uncontrolled migration. As previously outlined, when immigration flows exceed our capacity to properly vet aliens at the border, the risks are compounded by the inability to access reliable law enforcement or security information from the alien's country of origin. The joint assessment by the Secretary of State, Secretary of Homeland Security, and Director of National Intelligence has found that Haiti lacks a functioning central authority capable of maintaining or sharing such critical information. Coupled with the serious threat posed by Haitian gangs – such as those designated by the State Department as Foreign Terrorist Organizations – continuing TPS for Haiti is not in the national interest.

This lack of government control has not only destabilized Haiti internally but has also had direct consequences for U.S. public safety. Haitian gang members have already been identified among those who have entered the United States and, in some cases, have been apprehended by law enforcement for committing serious and violent crimes. For example, in January 2025, U.S. Immigration and Customs Enforcement (ICE) apprehended Wisteguens Jean Quely Charles, a member of a violent Haitian street gang, who had been arrested, charged and convicted for 17 crimes between August 2022 and August 2024 including both "possession of and possession to distribute controlled substances, distribution of controlled substances, trespassing, carrying dangerous weapon to wit brass knuckles, possession of a firearm without a permit, possession of ammunition without a permit, assault and battery with a dangerous weapon, assault and battery, and resisting arrest."[27] This case underscores the broader risk posed by rising Haitian

---

[27] U.S. Immigration and Customs Enforcement, "ICE ERO Boston arrests Haitian gang member with numerous convictions" (Jan. 24, 2025), available at: https://www.ice.gov/news/releases/ice-ero-boston-arrests-haitian-gang-member-numerous-convictions.

migration, particularly in light of multiple large-scale prison breaks in Haiti[28] and the increasing numbers of encounters reported by U.S. Customs and Border Protection. The inability of the previous administration to reliably screen aliens from a country with limited law enforcement infrastructure and widespread gang activity presents a clear and growing threat to U.S. public safety.

In E.O. "America First Policy Directive to the Secretary of State," President Trump declared "from this day forward, the foreign policy of the United States shall champion core American interests and always put America and American citizens first." Moreover, it instructed "as soon as practicable, the Secretary of State shall issue guidance bringing the Department of State's policies, programs, personnel, and operations in line with an America First foreign policy, which puts America and its interests first."[29] The current situation in Haiti is concerning. However, the United States must prioritize its national interests, which includes assessing foreign policy, public safety, national security, migration factors, immigration policy, and economic considerations. In considering these factors individually and cumulatively, the Secretary has determined that permitting Haitian nationals to remain temporarily in the United States is contrary to the U.S. national interest.

---

[28] *See* The Guardian "Haiti declares state of emergency after thousands of dangerous inmates escape" (Mar. 4, 2024) ("Haiti has declared a three-day state of emergency and a night-time curfew after armed gangs stormed the country's two biggest jails, allowing more than 3,000 dangerous criminals, including murderers and kidnappers, to escape back on to the streets of the poor and violence-racked Caribbean nation."), available at: https://www.theguardian.com/world/2024/mar/04/haiti-mass-jailbreak-violence-port-au-prince-gangs; Al Jazeera, "Haiti declares curfew after 4,000 inmates escape jail amid rising violence" (Mar. 4, 2024) ("Haiti's government has declared a state of emergency and imposed a curfew after an explosion of gang-led violence over the weekend saw thousands of prisoners escape after assaults on the country's two biggest prisons."), available at: https://www.aljazeera.com/news/2024/3/4/thousands-of-inmates-escape-prison-amid-deepening-haiti-violence; *see also* Reuters, "Haiti prison break leaves 12 dead as inmates go hungry" (Aug. 16, 2024) ("A prison break in the Haitian city of Saint-Marc left 12 inmates dead on Friday, Mayor Myriam Fievre said, the third such incident in Haiti in recent months amid a protracted humanitarian crisis fueled by gang violence."), available at: https://www.reuters.com/world/americas/haitian-inmates-escape-prison-third-recent-jailbreak-miami-herald-says-2024-08-16/.
[29] 90 FR 8337.

DHS estimates there are approximately 348,187 nationals of Haiti (and aliens having no nationality who last habitually resided in Haiti) who hold TPS under Haiti's designation.[30]

**Effective Date of Termination of the Designation**

The TPS statute provides that the termination of a country's TPS designation may not be effective earlier than 60 days after the FRN is published or, if later, the expiration of the most-recent previous extension. *See* INA sec. 244(b)(3)(B), 8 U.S.C. 1254a(b)(3)(B).

The TPS statue authorizes the Secretary, at her discretion, to allow for an extended "orderly transition" period with respect to the termination and the expiration of any TPS-related documentation, such as EADs. The Secretary, however, has determined in her discretion that a 60-day transition period is sufficient and warranted here given the Secretary's finding that continuing to permit the Haitian nationals to remain temporarily in the United States is contrary to the U.S. national interest. Moreover, adhering to the default statutory 60-day period for orderly transition is consistent with the precedent of previous TPS country terminations over the past few months and makes clear that the United States is committed to clarity and consistency. *See* INA sec. 244(d)(3), 8 U.S.C. 1254a(d)(3). Accordingly, the termination of the Haiti TPS designation will be effective 60 days from this notice's publication date.[31]

---

[30] As of May 1, 2025, approximately 15,578 of these Haitian nationals (and aliens having no nationality who last habitually resided in Haiti) are also approved as Lawful Permanent Residents. Data queried by Department of Homeland Security, U.S. Citizenship and Immigration Services, Office of Performance and Quality [May 2025].

[31] *See* 8 CFR 244.19 ("Upon the termination of designation of a foreign state, those nationals afforded temporary Protected Status shall, upon the sixtieth (60th) day after the date notice of termination is published in the *Federal Register*, or on the last day of the most recent extension of designation by the [Secretary of Homeland Security], automatically and without further notice or right of appeal, lose Temporary Protected Status in the United States. Such termination of a foreign state's designation is not subject to appeal.").

DHS recognizes that Haiti TPS beneficiaries continue to be employment authorized during the 60-day transition period.[32] Accordingly, through this FRN, DHS automatically extends the validity of certain EADs previously issued under the TPS designation of Haiti through [**INSERT DATE 60 DAYS AFTER DATE OF PUBLICATION IN THE FEDERAL REGISTER**]. Therefore, as proof of continued employment authorization through [**INSERT DATE 60 DAYS AFTER DATE OF PUBLICATION IN THE FEDERAL REGISTER**], TPS beneficiaries can show their EADs that have the notation A-12 or C-19 under Category and a "Card Expires" date of February, 3, 2026, August 3, 2025, August 3, 2024, June 30, 2024, February 3, 2023, December 31, 2022, October 4, 2021, January 4, 2021, January 2, 2020, July 22, 2019, January 22, 2018, or July 22, 2017.

The Secretary has considered putative reliance interests in the Haiti TPS designation, especially when considering whether to allow for an additional transition period akin to that allowed under certain previous TPS terminations. Temporary Protected Status, as the name itself makes clear, is an inherently temporary status. TPS designations are time-limited and must be periodically reviewed, and TPS notices clearly notify aliens of the designations' expiration dates, and whether to allow for an orderly transition period is left to the Secretary's unfettered discretion. *See* INA sec. 244(b)(3), (d)(3); 8 U.S.C. 1254a(b)(3), (d)(3). The statute inherently contemplates advance notice of a termination by requiring timely publication of the Secretary's determination and delaying the effective date of the termination by at least 60 days after publication of a *Federal Register* notice of the termination or, if later, the existing expiration date. *See* INA sec. 244(b)(3)(A)-(B), (d)(3); 8 U.S.C. 1254a(b)(3)(A)-(B), (d)(3).

---

[32] *See* INA 244(a)(1)(B), 8 U.S.C. 1254a(a)(1)(B); *see also* 8 CFR 244.13(b).

**Notice of the Termination of the TPS Designation of Haiti**

By the authority vested in me as Secretary under INA section 244(b)(3), 8 U.S.C. 1254a(b)(3), I have reviewed, in consultation with the appropriate U.S. Government agencies, (a) conditions in Haiti; and (b) whether permitting the nationals of Haiti (and aliens having no nationality who last habitually resided in Haiti) to remain temporarily in the United States is contrary to the national interest of the United States. Based on my review, I have determined that Haiti no longer continues to meet the conditions for Temporary Protected Status (TPS) under INA section 244(b)(1)(C), 8 U.S.C. 1254a(b)(1)(C).

Accordingly, I order as follows:

(1) Pursuant to INA section 244(b)(3)(B), 8 U.S.C. 1254a(b)(1)(B), and considering INA section 244(d)(3), 8 U.S.C. 1254a(d)(3), the designation of Haiti for TPS is terminated effective at 11:59 p.m., local time, on [**INSERT DATE 60 DAYS AFTER DATE OF PUBLICATION IN THE FEDERAL REGISTER**].

(2) Information concerning the termination of TPS for nationals of Haiti (and aliens having no nationality who last habitually resided in Haiti) will be available at local USCIS office upon publication of this notice and through the USCIS Contact Center at 1-800-375-5283. This information will be published on the USCIS website at www.uscis.gov.

**Kristi Noem**
Secretary of Homeland Security

[FR Doc. 2025-12224 Filed: 6/27/2025 4:15 pm; Publication Date: 7/1/2025]