

Bryan Cave Leighton Paisner

June 30, 2025

BRYAN CAVE LEIGHTON PAISNER LLP
1155 F Street NW
Washington DC 20004 1357
T: +1 202 508 6000
F: +1 202 508 6200

bclplaw.com

Andrew Tauber
Counsel
Direct:  +1 202 508 6111
Fax:  +1 202 220 7421
andrew.tauber@bclplaw.com

Hon. Brian M. Cogan, U.S.D.J.
United States District Court for the Eastern District of New York
225 Cadman Plaza East
Brooklyn, NY 11201

Re: **Secretary Noem's failure to give timely notice as required by 8 U.S.C. § 1254a(b)(3)(A)**
*Haitian Evangelical Clergy Ass'n v. Trump*, No. 25-cv-1464

Dear Judge Cogan:

Plaintiffs write in response to the government's letter of June 27, 2025 (ECF 61).

As the Court knows, 8 U.S.C. § 1254a(b)(3)(A) requires the Secretary of Homeland Security to conduct a periodic review to determine whether the statutory conditions for a country's TPS designation continue to exist and to then "timely" publish notice of that determination in the Federal Register.

The government says that Secretary Noem completed the statutorily mandated periodic review of Haiti's TPS designation on June 4 and that notice of the Secretary's decision terminating Haiti's TPS designation "will be published about 4 weeks after the Secretary's determination to terminate TPS for Haiti." ECF 61 at 1. The government argues that the notice will be "timely" within the meaning of § 1254a(b)(3)(A) despite the month-long delay because TPS holders will have 60 days to leave the country after its publication.

The government's construction of "timely" contradicts the longstanding practice of all prior administrations.

Seeking to bolster its interpretation of "timely" at the June 25 hearing, the government stated that it was aware of "ten prior occasions where the issuance of a Federal Register notice of a decision [under § 1254a(b)(3)(A)] has been delayed longer than a month after the decision was made." Hrg. Tr. 9:13–15 (June 25, 2025). The lone example the government gave was notice of Lebanon's TPS designation in 2024.

But, as noted, that notice was notice of a designation, not a termination. There is a material difference between the two. A designation creates reliance interests; a termination impairs those interests.

The Court acknowledged this distinction at the June 25 hearing. Hrg. Tr. 14:3–17. Consequently, when directing the government to submit a letter identifying past instances in which notice of a determination was delayed by more than a month, the Court told the government, "[p]lease don't give me examples that are readily distinguishable." *Id.* at 15:8–9. Yet that is precisely what the government has done. Each example cited in its letter was notice of a designation or the extension of a designation; none was notice of a termination. ECF 61 at 1–2.[1]

---

[1] In its letter, the government says that "a gap in time between the Secretary's TPS determination and the publication of a Notice can occur for many possible reasons." ECF 61 at 2. Notably, however, the government gives no explanation why Secretary Noem withheld notice of her determination in this case.

Hon. Brian M. Cogan, U.S.D.J.
June 30, 2025
Page 2



Plaintiffs have identified numerous termination notices since enactment of the TPS statute. Although the list that they have compiled might not capture all prior termination notices, Plaintiffs have identified 18 such notices. *See* Ex. 1 (compiling termination notices); Ex. 2 (chart summarizing relevant dates).

A review of those notices shows that no prior administration has interpreted § 1254a(b)(3)(A) as does the current administration.

***Every prior termination notice except two simultaneously extended the relevant country's TPS designation by 6 to 18 months before the termination became effective***. In 14 of the 18 previous terminations, the affected TPS holders were given between six- and eighteen-months' notice of the impending termination; in two of the remaining instances, they were given five-and-a-half months' notice.

The reason for this is plain. TPS holders need time to wind down their affairs in the United States. This is why Congress requires "timely" notice of an administration's intent to terminate a TPS designation. And it is why every prior administration has understood that "timely" means "far enough in advance of actual termination so that the affected individuals can reasonably plan for their repatriation."

Recognizing this, termination notices issued by previous administrations have extended TPS designations precisely ***because*** the administration was terminating those designations. As DHS explained when announcing the termination of Guinea's TPS designation: "the Secretary of the Department of Homeland Security … has determined that conditions in Guinea no longer support its designation for TPS and is ***therefore*** extending TPS benefits for 6 months for the purpose of orderly transition before the TPS designation of Guinea terminates." Six-Month Extension of Temporary Protected Status Benefits for Orderly Transition Before Termination of Guinea's Designation for Temporary Protected Status, 81 Fed. Reg. 66064 (Sept. 26, 2016) (emphasis added).

Even the first Trump administration recognized this—including with respect to Haiti specifically. For example, the 2018 notice terminating Haiti's TPS designation stated that "[t]o provide time for an orderly transition, this termination is effective on July 22, 2019, 18 months following the end of the current designation." Termination of the Designation of Haiti for Temporary Protected Status, 83 Fed. Reg. 2648 (Jan. 18, 2018).

Plaintiffs are aware of only four instances in the 35 years since the TPS statute was enacted that TPS holders have received less than 6-months' notice that they would lose their TPS status.

Two—involving Bosnia and Rwanda—were instances in which the Secretary had failed to make a determination more than 60 days before expiration of the respective designations. The corresponding termination notices acknowledged that the designations had therefore been automatically extended for 6 months by operation of 8 U.S.C. § 1254a(b)(3)(C). Each notice was published within a few weeks of the previously scheduled expiration date, giving the affected TPS holders approximately five-and-a-half-months' notice before the termination would take effect.

The third instance was the 1992 termination of Kuwait's designation. But it is the exception that proves the rule. Kuwait had been designated for less than 10 months when notice of the termination was published in the Federal Register. As a result, unlike Haitian TPS holders today and TPS holders from most other countries whose designations were previously terminated, Kuwait TPS holders had yet to fully settle in the United States before notice that their home country's designation would be terminated was published in the Federal Register.

The only other instance in which TPS holders were given less than six-months' notice before having to leave the U.S. was the 2003 termination of Angola's TPS designation. Although the designation had been



in place three years when notice of its termination was given, that still is significantly less time than many other terminated TPS designations, several of which had been in place more than seventeen years. Moreover, because there were only 316 Angolan TPS holders, terminating Angola's designation would not unleash a sudden flood of returnees that would exceed the country's capacity to feed, house, employ, and care for its returning citizens.

Haiti's TPS designation, by contrast, has been in place for more than fifteen years and covers an estimated 350,000 Haitians. By now, Haitian TPS holders are fully integrated into their American communities. They have not only built businesses and launched careers in the United States but have also married and given birth to U.S. citizens. It will take more than 60 days for them to arrange their affairs and prepare for repatriation. Indeed, because the sudden return of so many individuals would overwhelm Haiti's already beleaguered resources, Haitian TPS holders would be forced to return home without having been able to arrange—and without realistic prospects of being able to arrange—food, housing, jobs, or medical care.[2]

In the history of the TPS statute, no prior administration has given a large contingent of TPS holders present in the United States for many years only sixty-days' notice to settle their affairs and depart the country. Simply put, the current administration's construction of "timely" is unprecedented and unreasonable. As recognized by prior administrations, "timely" notice is notice given sufficiently far in advance of actual termination to give the affected TPS holders adequate time to wind down their affairs in this country and arrange the bare necessities of life in their home country.

Lack of timely notice aside, two things are clear.

First, the soon-to-be published termination notice dispels any doubt that Plaintiffs have standing and that their claims are ripe.

Second, there is no question that this Court has jurisdiction to adjudicate Plaintiffs' *ultra vires* claim. The government has conceded as much. Indeed, the government has squarely admitted that the Court can "look at legal questions surrounding the interpretation of the [TPS] statute," including the question "whether or not there was implicit authority" for the Secretary to issue the "partial vacatur." ECF 25-1 (Hrg. Tr. 50:4–15, *Nat'l TPS Alliance v. Noem*, No. 3:25-cv-01766 (N.D. Cal. Mar. 24, 2025)). Consistent with its prior admission, the government recently told this Court that "***[w]hen*** the Secretary has reached a determination, it becomes unreviewable under the statute." Hrg. Tr. 10:24–25 (June 25, 2025) (emphasis added). Here, the government acknowledges that the February 24 "partial vacatur"—the administrative action at issue in this case—contains no determination. *Cf. id.* at 11:1–4 (government counsel distinguishing between the partial vacatur and the Secretary's subsequent termination determination). Indeed, the "partial vacatur" explicitly eschewed any determination, explaining that Secretary Noem "intend[ed] to review the Haiti TPS designation by June 4," which was then more than three months in the future. Partial Vacatur of 2024 Temporary Protected Status Decision for Haiti, 90 FR 10511, 10514 (February 24, 2025). Thus, as the government has previously admitted, nothing bars the Court from reviewing the "partial vacatur" and "hold[ing] it unlawful" as "in excess of statutory authority." 5 U.S.C. § 706.

Respectfully submitted,

*/s/ Andrew Tauber*

Andrew E. Tauber

---

[2] The 350,000 TPS holders represent 3% of Haiti's population of approximately 11.6 million people. If the same percentage of the U.S. population, which is approximately 340 million people, abruptly returned to the States, it would mean a sudden influx of more than 10 million people, a number that even a wealthy nation like the U.S. could not accommodate in a 60-day period.